# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF GEORGIA
## ATHENS DIVISION

ROAD TESTED PARTS, INC., d/b/a
WEAVERPARTS.COM, individually and on behalf of
all others similarly situated,

      Plaintiff,

    v.

HONDA MOTOR CO., LTD., AMERICAN HONDA
MOTOR CO., INC.,HONDA R&D CO., LTD, HONDA
OF AMERICA MFG., INC., BAYERISCHE
MOTOREN WERKE AG, BMW OF NORTH
AMERICA, LLC, BMW MANUFACTURING CO.,
LLC, FORD MOTOR COMPANY, TOYOTA MOTOR
CORPORATION, TOYOTA MOTOR SALES, U.S.A.,
INC., AND TOYOTA MOTOR ENGINEERING &
MANUFACTURING NORTH AMERICA, INC.,
MAZDA MOTOR CORPORATION, MAZDA
MOTOR OF AMERICA, INC., MITSUBISHI
MOTORS CORP., MITSUBISHI MOTORS NORTH
AMERICA, INC., NISSAN MOTOR CO., LTD.,
NISSAN NORTH AMERICA, INC., FUJI HEAVY
INDUSTRIES, LTD., SUBARU OF AMERICA, INC.,

      Defendants.

Civil Action File

No. _____

**JURY TRIAL DEMANDED**

---

# CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

NATURE OF CLAIMS ........................................................................................... 1

JURISDICTION AND VENUE ............................................................................ 11

THE PARTIES ..................................................................................................... 11

    I.    Defendants ................................................................................................ 11

    II.   Plaintiff and the Classes ......................................................................... 16

GENERAL ALLEGATIONS .............................................................................. 18

    I.    Defendants Used Takata Airbags Which Have a Common, Uniform
        Defect ...................................................................................................... 34

        A.  Takata Recklessly Chose an Inexpensive and Dangerous Propellant ......... 34

        B.  Takata's Knowledge of the Inflator Defect ........................................ 37

    II.   Takata Airbag Failures and Defendants' Inadequate Reaction ............... 40

        A.  2003-2008: Early Incidents and the 2008 Honda Recall (08V-593) ........ 40

        B.  2008-2009: Additional Incidents, the 2009 Honda Recall (09V-259),
            and Honda's and Takata's Misleading Reporting to NHTSA ................ 43

        C.  2010: The 2010 Recall (10V-041) and Honda's Shifting
            Explanations ..................................................................................... 48

        D.  2011-2012: Mounting Honda Recalls, Including the 2011 Recall
            (11V-260) ......................................................................................... 49

        E.  2013-2014: Takata's Belated Admissions of Broader Defects and the
            2013 Recall (13V-132) .................................................................... 52

        F.  2014-2015: Forced National Recall and Takata's Admission of a
           Defect .............................................................................................. 57

    III.  The Vehicle Manufacture Defendants Sold Their Vehicles as "Safe" and
        "Reliable" ................................................................................................ 63

    IV.  Automotive Recyclers Purchased Vehicles Containing Defective
        Airbags for Amounts Greater Than Their Actual Value and Maintained
        the Defective Airbags for the Purposes of Resale ................................... 71

TOLLING OF THE STATUTE OF LIMITATIONS ........................................... 72

CLASS ACTION ALLEGATIONS ...................................................................... 74

REALLEGATION AND INCORPORATION BY REFERENCE ......................... 80

CLAIMS FOR RELIEF ...................................................................................... 80

    Count I: Violation of 18 U.S.C. § 1962(c), the Racketeer Influenced and
    Corrupt Organizations Act ("RICO"), Against Honda Defendants .................... 80

    Count II: Violation of the Lanham (Trademark) Act, 15 U.S.C. §§ 1501 *et seq.* .............. 89

    Count III: Fraudulent Concealment ................................................................ 97

    Count IV: Violation of the Georgia Uniform Deceptive Trade Practices Act, Ga.
    Code Ann. §§ 10-1-370, *et seq.* ..................................................................... 99

    Count V: Violation of the North Carolina Unfair and Deceptive Trade Practices
    Act, N.C. Gen. Stat. §§ 75-1.1, *et seq.* .......................................................... 104

PRAYER FOR RELIEF ...................................................................................... 109

DEMAND FOR JURY TRIAL .......................................................................... 110

Plaintiff, based on personal knowledge as to itself, and upon information and belief as to all other matters, alleges as follows:

## NATURE OF CLAIMS

1.      People and businesses trust and rely on the manufacturers of motor vehicles and of critical safety devices to make safe products that do not give rise to a clear danger of death or personal injury.  An airbag is a critical safety feature of any motor vehicle.  Airbags are meant to inflate rapidly during an automobile collision to prevent occupants from striking hard objects in the vehicle, such as the steering wheel, dashboard, or windshield.

2.      An airbag supplier must take all necessary steps to ensure that its products—which literally can make the difference between life and death in an accident—function as designed, specified, promised, and intended. Profits must take a back seat to safety for the airbag manufacturer, and also for the automobile manufacturer when it makes its product sourcing decisions.

3.      This action concerns defective airbags manufactured by Takata Corporation and its related entities ("Takata"), and equipped in vehicles manufactured by Honda, BMW, Ford, Mazda, Mitsubishi, Nissan, Subaru, and Toyota, and their related entities (collectively the "Defendants"), and in vehicles manufactured by Chrysler and General Motors among others.

4.      All Takata airbags at issue in this litigation share a common, uniform defect: the use of ammonium nitrate, a notoriously volatile and unstable compound, as the propellant in their defectively designed inflators (the "Inflator Defect").  The inflator, as its name suggests, is supposed to inflate the airbag upon vehicle impact.  In the milliseconds following a crash, the inflator ignites a propellant to produce gas that is released into the airbag cushion, causing the airbag cushion to expand and deploy.

1

5.     The following basic illustration depicts Takata's airbag module:



6.     In the late 1990s, Takata shelved a safer chemical propellant in favor of ammonium nitrate, a far cheaper and more unstable compound that is much better suited for large demolitions in mining and construction.

7.     Under ordinary conditions, including daily temperature swings and contact with moisture in the air, Takata's ammonium nitrate propellant transforms and destabilizes, causing irregular and dangerous behavior ranging from inertness to violent combustion.  When Takata decided to abandon the safer propellant in favor of the more dangerous but cheaper one, it was aware of these risks and did so over the objections and concerns of its engineers in Michigan.

2

Tellingly, Takata appears to be the only major airbag manufacturer that uses ammonium nitrate as the primary propellant in its airbag inflators.

8.      As a result of the common, uniform Inflator Defect, instead of protecting vehicle occupants from bodily injury during accidents, the defective Takata airbags too often either fail to deploy or violently explode, sometimes expelling metal debris and shrapnel at vehicle occupants.  As of January 2015, complaints to regulators blame Takata airbags for at least seven deaths and 139 injuries, including at least 37 reports of airbags that ruptured or spewed metal or chemicals.

9.      When the Defendants purchased Takata's airbags for their vehicles, they were aware that the airbags used the volatile and unstable ammonium nitrate as the primary propellant in the inflators.

10.     The volatility and instability of Takata's ammonium nitrate propellant has been underscored by the glaring and persistent quality control problems that have plagued Takata's manufacturing operations.

11.     Defendants first received word of startling airbag failures no later than2003, when a Takata inflator ruptured in a BMW vehicle in Switzerland.  BMW and Takata jointly investigated the incident in one of Takata's Michigan facilities, and inaccurately minimized the incident as an anomaly, without alerting federal safety regulators.

12.     Similarly, in 2004, a Takata airbag in a Honda Accord in Alabama exploded, shot out metal shrapnel, and severely injured the car's driver.  Honda and Takata investigated the incident and inaccurately minimizedit as "an anomaly."  Honda did not issue a recall.  Neither Honda nor Takata sought the involvement of federal safety regulators.

13.    The serious danger posed by the Inflator Defect was not disclosed to U.S. safety regulators until 2008, despite red flags raised by prior Takata airbag ruptures or explosions.  It took three additional reports of airbag rupture incidents in 2007 to prompt the 2008 disclosure, and even then, Honda falsely assured regulators that they needed to recall only approximately 4,000 Honda vehicles, claiming that they had identified all "possible vehicles that could potentially experience the problem."

14.    Behind the scenes, however, Honda were busy conducting tests that revealed far more serious problems.  As reported in *The New York Times*, Takata conducted secret tests in 2004, which confirmed that its inflators were defective, and then destroyed those test results to conceal the defect.  After a 2007 airbag rupture, Honda began collecting inflators for further testing as well.

15.    Tragically, these airbag failures were the first of many to come. Honda and Takata were forced to issue further recalls in 2009, 2010, and 2011, but they did so in a limited and misleading way, apparently in an effort to avoid the huge costs and bad publicity that would have been associated with appropriately-sized and broader recalls.  Despite the repeated Takata/Honda recalls, and though the other Defendants knew their vehicles were also equipped with Takata airbags containing ammonium nitrate, they failed to take reasonable measures to investigate.

16.    Over a decade after the first incidents of airbag ruptures, Defendants' obfuscation and inaction broke down in the face of mounting incidents and increased scrutiny by regulators, the press, and private plaintiffs.  By the middle of 2013, the pace of the recalls increased exponentially as the National Highway Traffic Safety Administration ("NHTSA") began to force Defendants into action.  Whereas approximately 3 million vehicles had been recalled up until

4

that point (the vast majority of which were Hondas), the April-May 2013 recalls added 4 million more vehicles to the list, across ten manufacturers.  Just one year later, in June 2014, another 5.6 million vehicles were recalled.  By October 2014, global recalls reached an approximated 16.5 million vehicles.

17.     Even then, Defendants worked hard to limit the scope of the recall to humid parts of the country.  They strenuously and falsely claimed that the risks caused by the Inflator Defect disappeared to the north of some arbitrary latitude in the American South.  And they mischaracterized the Inflator Defect as the product of idiosyncratic manufacturing flaws.

18.     By November 2014, in anticipation of a United States Senate hearing to be attended by Takata and the major automakers, NHTSA demanded that the recall be expanded to the entire country for certain driver's side airbags, citing airbag rupture incidents in North Carolina and California.  Incredibly, Takata refused, and testified at Congressional hearings that vehicles in non-humid regions were safe, *even as it claimed that it had not yet determined the root cause of the failures*.

19.     With additional pressure and public scrutiny, the Defendants eventually agreed to NHTSA's demand.  At that point, reports of the total number of recalled vehicles escalated to approximately 17 million in the United States and 25 million worldwide.

20.     In response to the additional pressure and public scrutiny, Defendants were forced to consult with external explosives and airbag specialists, and performed additional testing on Takata's airbags.  This testing confirmed what Defendants already knew: Takata's airbags containing ammonium nitrate were defective and prone to rupture.

21.     In light of this testing, Takata was unable to deny the existence of the Inflator Defect any longer.  On May 18, 2015, Takata filed four Defect Information Reports ("DIRs")

with NHTSA and agreed to a Consent Order regarding its (1) PSDI, PSDI-4, and PSDI-4K driver air bag inflators; (2) SPI passenger air bag inflators; (3) PSPI-L passenger air bag inflators; and (4) PSPI passenger air bag inflators, respectively.  After concealing the Inflator Defect for more than a decade, Takata finally admitted that "a defect related to motor vehicle safety may arise in some of the subject inflators."  And in testimony presented to Congress following the submission of its DIRs, Takata's representative admitted that the use of ammonium nitrate is a factor that contributes to the tendency of Takata's airbags to rupture, and that as a result, Takata will phase out the use of ammonium nitrate.  Still, even Takata's recent defect admission is inaccurate and misleading, because the Inflator Defect is manifest in each of Takata's inflators containing ammonium nitrate.  And shockingly, Takata still intends to produce new inflators with ammonium nitrate, even after conceding that such inflators create an unacceptable public safety hazard.

22.     Further, in its DIRs, Takata acknowledged that the defect is present in inflators that were installed in vehicles as replacement parts through prior recalls, necessitating a second recall of those vehicles.

23.     As a result of Takata's admission that its inflators are defective, NHTSA estimates there are 46 million defective inflators in over 34 million vehicles in the United States. While Takata has records of which manufacturers it sold defective inflators to, it claims not to have records of which vehicles those inflators were installed in.  The Vehicle Manufacturers possess those records, however, and are thus in the process of identifying which vehicles must be recalled based on Takata's DIRs.

24.     As a result of Defendants' concealment of the Inflator Defect for more than a decade, the recalls now underway cannot be implemented effectively.  Defendants have

acknowledged that the process could take at least three *years* because of supply constraints. Even before Takata announced that its inflators were defective and the number of recalled vehicles increased, Honda's spokesman acknowledged that "[t]here's simply not enough parts to repair every recalled single car immediately."

25.    Even if there were enough airbags, dealers are unable to keep up with the volume of customers rushing to get their Takata airbags replaced. Following the expanded recalls in late 2014, some dealers reported receiving up to *900 calls per day* about the recalls, and told customers that they may have to wait months before airbags can be replaced. And following Takata's submission of the May 18th DIRs, NHTSA's recall website received over one million visits.

26.    Consumers are, therefore, in the frightening position of having to drive dangerous vehicles for many months (or even years) while they wait for Defendants to replace the defective airbags in their cars. Most of the Defendants are not providing replacement or loaner vehicles, even though there is an immediate need to provide safe vehicles to Plaintiff and Class members. For example, Toyota has simply disabled the dangerous passenger-side airbags in vehicles, and has offered stickers to paste onto the dashboard as a reminder not to sit in that seat. Likewise, General Motors has recommended owners prohibit anyone from riding in the passenger seat. As a result, many consumers are effectively left without a safe vehicle to take them to and from work, to pick up their children from school or childcare, or, in the most urgent situations, to transport themselves or someone else to a hospital.

27.    Worse yet, certain recalls for passenger-side airbags remain regional in scope. This is an indefensible and unnecessarily risky approach because: (a) Defendants have claimed they have yet to uncover the root cause of the Inflator Defect, making their geographic

boundaries arbitrary at best; (b) the passenger-side airbags are made with the same unstable and

dangerous ammonium nitrate propellant that is prone to overly-aggressive combustion and

becoming inert; (c) vehicles are by definition mobile and therefore can and likely will be

operated in high humidity regions; and (d) weather and climate are unpredictable and variable.

28.     Even more troubling, many of the replacement airbags that Takata and the vehicle

manufacturers are using to "repair" recalled vehicles suffer from the same common, uniform

defect that plagues the airbags being removed—they use unstable and dangerous ammonium

nitrate as the propellant within the inflator, a fact that Takata's representative admitted at a recent

Congressional hearing.  At the Congressional hearing, the Takata representative repeatedly

refused to provide assurances that Takata's replacement air bags are safe and defect-free.

29.     Defendants knew or should have known that the Takata airbags installed in

millions of vehicles were defective.  Defendants, who concealed their knowledge of the nature

and extent of the defect from the public while continuing to advertise their products as safe and

reliable, have shown a blatant disregard for public welfare and safety.  Moreover, the Defendants

have violated their affirmative duty, imposed under the Transportation Recall Enhancement,

Accountability, and Documentation Act (the "TREAD Act"), to promptly advise customers

about known defects.

30.     The actions of Defendant Honda have been especially disturbing.  Despite the

shocking record of injuries and failures in Honda vehicles, Honda was slow to report the full

extent of the danger to drivers and passengers, and they failed to issue appropriate recalls.

Honda provided contradictory and inconsistent explanations to regulators for the Inflator Defect

in Takata's airbags, which led to more confusion and delay.  Indeed, the danger of defective

airbags and the number of vehicles affected was concealed for years after it became apparent

8

there was a potentially lethal problem.  Although Honda repeatedly had actual knowledge and/or were on notice of, and failed to fully investigate, the problem and issue proper recalls, they allowed the problem to proliferate and cause numerous injuries and several deaths over the last 13 years.

31.     Even before purchasing inflators from Takata, the Defendants were aware that Takata used volatile and unstable ammonium nitrate as the primary propellant in its inflators, and thus the Defendants were on notice of the Inflator Defect even before they installed the inflators in their vehicles, because Takata reviewed the designs of the inflators with the Vehicle Manufacturers and the Vehicle Manufacturers approved the designs.  The Defendants were also put on notice of the Inflator Defect not later than 2008, when Honda first notified regulators of a problem with its Takata airbags.  Because their vehicles also contained Takata airbags, the Defendants knew or should have known at that time that there was a safety problem with their airbags, and the Defendants should have launched their own investigations and notified their customers.  That responsibility only grew as incidents multiplied.

32.     Instead, Defendants put profits ahead of safety.  Takata cut corners to build cheaper airbags, and the Defendants sold vehicles that they knew or should have known contained those defective airbags.  For several years Defendants engaged in a pattern of reckless disregard, deception, concealment, and obfuscation. Only very recently – on the heels of media scrutiny – have Defendants begun recalling the millions of vehicles in the United States with the Inflator Defect.

33.     As a result of Defendants' misconduct, Plaintiff and members of the proposed Classes were harmed and suffered actual damages.  The defective Takata airbags are worthless and they also significantly diminish the value of the vehicles in which they are installed.

34.     Further, Plaintiff and the Classes did not receive the benefit of their bargain; rather, they purchased vehicles that are of a lesser standard, grade, and quality than represented, and they did not receive vehicles that met ordinary and reasonable consumer and business expectations regarding safe and reliable operation.  Purchasers of the Class Vehicles paid more than they would have had the Inflator Defect been disclosed.

35.     The defective Takata airbags create a dangerous condition that gives rise to a clear, substantial, and unreasonable danger of death or personal injury.

36.     Automotive recyclers like Plaintiff and members of the Classes purchased Class Vehicles and the defective Takata airbags contained in the vehicles, but are now unable to sell the airbags, which are essentially valueless.  Had they known the truth about the problems associated with the Inflator Defect, the automotive recyclers would not have purchased the Class Vehicles and airbags contained therein or would have paid a reduced amount.  Moreover, automotive recyclers have suffered economic injury as they incurred additional costs for storing, maintaining, or otherwise disposing of the defective Takata airbags.

37.     The damage suffered by the automotive recyclers extends far beyond the defective airbags they purchased which are now essentially worthless.  Plaintiff and members of the Classes paid more for the vehicles (and parts contained therein) with defective airbags than they would have had they known of the defect.  The Class Vehicles (and their constituent parts) have diminished in value as a direct result of Defendants' conduct, further injuring Plaintiff and members of the Classes.  These damages will likely continue as the magnitude of the recalls is absorbed into the industry.

## JURISDICTION AND VENUE

38.     Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because members of the proposed Class are citizens of states different from Defendants' home states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.  Also, jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331, because Plaintiff's Lanham Act and RICO claims arise under federal law, and this Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

39.     This Court has personal jurisdiction over Plaintiff because Plaintiff submits to the Court's jurisdiction. This Court has personal jurisdiction over Defendants, pursuant to Georgia Code § 9-10-91(1), (2) and (3), because they transact business in this District; committed a tortious act or omission within this District; and regularly do or solicit business, or engage in other persistent sources of conduct, or derive substantial revenue from goods used or consumed or services rendered in this District and committed a tortious injury in this District caused by an act or omission outside this District.

40.     Venue is proper in this Court pursuant to M.D. LR 3.4 and 28 U.S.C. § 1391(a) because Plaintiff resides in this district, a substantial part of the events or omissions giving rise to these claims occurred in this District, Defendants have caused harm to Class members residing in this District, and Defendants are residents of this District under 28 U.S.C. §1391(c)(2) because they are subject to personal jurisdiction in this district.

## THE PARTIES

### I.    Defendants

41.     Defendant Honda Motor Co., Ltd. ("Honda Motor") is a foreign for-profit corporation with its principal place of business in Tokyo, Japan.  Honda Motor manufactures and

sells motorcycles, automobiles, and power products through independent retail dealers, outlets, and authorized dealerships primarily in Japan, North America, Europe, and Asia.

42.     Defendant American Honda Motor Co., Inc. ("American Honda") is a subsidiary of Honda Motor headquartered in Torrance, California.  American Honda conducts the sale, marketing, and operational activities for Honda cars, trucks, sport utility vehicles, and automobile parts in the United States. American Honda manufactures and assembles its vehicles for sale in the United States in automobile plants located in Greensburg, Indiana; East Liberty, Ohio; Lincoln, Alabama; and Marysville, Ohio.

43.     Defendant Honda of America Mfg Inc. ("Honda Mfg") is an Ohio corporation with its principal place of business in Marysville, Ohio. Honda Mfg is a subsidiary of Honda Motor. Honda Mfg is involved in the design, manufacture, testing, marketing, distribution and sale of Honda vehicles in the United States, including those utilizing Takata airbags.

44.     Defendant Honda R&D Co. Ltd. ("Honda R & D") is a Japanese corporation with its principal place of business in Wako, Japan. Honda R&D is a subsidiary of Honda Motor. Honda R&D is involved in the design, development, manufacture, assembly, testing, distribution and sale of Honda vehicles, including those utilizing Takata airbags.

45.     Defendants Honda Motor, Honda Mfg, Honda R&D, and American Honda are collectively referred to as "Honda"or "Honda Defendants."Honda vehicles sold in the United States contain defective airbags manufactured by Takata.  The Honda Defendants deliver these products into the stream of commerce with the expectation that they will be purchased by consumers in the United States and the State of Georgia.

46.     Defendant Bayerische Motoren Werke AG ("BMW AG") is a German holding company and automobile manufacturer.  BMW AG is headquartered in Munich, Bavaria,

Case 3:18-cv-00021-CDL    Document 1    Filed 02/22/18    Page 16 of 114


Germany.  BMW Group is a subsidiary of BMW AG and is also headquartered in Munich.

BMW AG, together with its subsidiaries, develops, manufactures, and sells cars and motorcycles

worldwide.

47.    Defendant BMW of North America, LLC ("BMW North America") is a

subsidiary of BMW AG and is headquartered in Woodcliff Lake, New Jersey.  BMW of North

America is the United States importer of BMW vehicles.

48.    Defendant BMW Manufacturing Co., LLC ("BMW Manufacturing") is a

subsidiary of BMW AG and is headquartered in Greer, South Carolina.  BMW Manufacturing is

the United States manufacturer of BMW vehicles.

49.    Defendants BMW AG, BMW North America, and BMW Manufacturing are

collectively referred to as "BMW" or "BMW Defendants."  BMW vehicles sold in the United

States contain defective airbags manufactured by Takata.  The BMW Defendants deliver these

products into the stream of commerce with the expectation that they will be purchased by

consumers and businesses in the United States and the State of Georgia.

50.    Defendant Ford Motor Company ("Ford") is headquartered in Dearborn,

Michigan.  Ford develops, manufactures, distributes, and services vehicles, parts, and accessories

worldwide, including in the United States.  Ford vehicles sold in the United States contain

defective airbags manufactured by Takata.

51.    Defendant Mazda Motor Corporation ("Mazda"), along with its subsidiaries,

develops, manufactures, and sells automotive vehicles worldwide.  Mazda's global headquarters

are located in Hiroshima, Japan.

52.    Defendant Mazda Motor of America, Inc. doing business as Mazda North

American Operations ("Mazda North American"), a subsidiary of Mazda, is a California

corporation with its corporate headquarters located in Irvine, California. Mazda North American is responsible for the distribution, marketing and sales of Mazda brand automobiles in the United States.

53.     Defendants Mazda and Mazda North American are collectively referred to as "Mazda" or the "Mazda Defendants." Mazda vehicles sold in the United States contain defective airbags manufactured by Takata. The Mazda Defendants deliver these products into the stream of commerce with the expectation that they will be purchased by consumers in the United States and the State of Georgia.

54.     Defendant Mitsubishi Motors Corporation ("Mitsubishi"), along with its subsidiaries, develops, manufactures, and sells automotive vehicles worldwide. Mitsubishi's global headquarters are located in Tokyo, Japan.

55.     Defendant Mitsubishi Motors North America, Inc. ("Mitsubishi North America"), a subsidiary of Mitsubishi, is a California corporation with its corporate headquarters located in Cypress, California. Mitsubishi North America is responsible for the distribution, marketing and sales of Mitsubishi brand automobiles in the United States.

56.     Defendants Mitsubishi and Mitsubishi North America are collectively referred to as "Mitsubishi" or the "Mitsubishi Defendants." Mitsubishi vehicles sold in the United States contain defective airbags manufactured by Takata. The Mitsubishi Defendants deliver these products into the stream of commerce with the expectation that they will be purchased by consumers in the United States and the State of Georgia.

57.     Defendant Nissan Motor Company, Ltd. ("Nissan"), along with its subsidiaries, develops, manufactures, and sells automotive vehicles worldwide. Nissan's global headquarters are located in Yokohama, Japan.

14

58.     Defendant Nissan North America, Inc. ("Nissan North America"), a subsidiary of Nissan, is a California corporation with its corporate headquarters located in Franklin, Tennessee.  Nissan North America is responsible for the distribution, marketing and sales of Nissan and Infiniti brand automobiles in the United States.

59.     Defendants Nissan and Nissan North America are collectively referred to as "Nissan" or the "Nissan Defendants."  Nissan vehicles sold in the United States contain defective airbags manufactured by Takata.  The Nissan Defendants deliver these products into the stream of commerce with the expectation that they will be purchased by consumers and businesses in the United States and the State of Georgia.

60.     Defendant Fuji Heavy Industries, Ltd. ("Fuji"), the parent company of Subaru, is a transportation conglomerate.  Along with its subsidiaries, Fuji develops, manufactures, and sells automotive vehicles worldwide.  Fuji's global headquarters are located in Tokyo, Japan.

61.     Defendant Subaru ("Subaru"), a subsidiary of Fuji, develops, manufactures, and sells automotive vehicles worldwide.  Subaru's global headquarters are located in Tokyo, Japan.

62.     Defendant Subaru of America, Inc. ("Subaru America"), a subsidiary of Fuji, is a New Jersey corporation with its corporate headquarters located in Cherry Hill, New Jersey. Subaru of America is responsible for the distribution, marketing and sales of Subaru brand automobiles in the United States.

63.     Defendants Fuji, Subaru and Subaru America are collectively referred to as "Subaru" or the "Subaru Defendants."  Subaru vehicles sold in the United States contain defective airbags manufactured by Takata.  The Subaru Defendants deliver these products into the stream of commerce with the expectation that they will be purchased by consumers and businesses in the United States and the State of Georgia.

64.     Defendant Toyota Motor Corporation ("Toyota") is the world's largest automaker and the largest seller of automobiles in the United States.  Toyota is a Japanese Corporation headquartered in Toyota City, Aichi Prefecture, Japan.

65.     Defendant Toyota Motor Sales, U.S.A., Inc. ("Toyota U.S.A.") is a wholly-owned subsidiary of Toyota Motor Corporation and is responsible for the marketing, sales, and distribution in the United States of automobiles manufactured by Toyota Motor Corporation. Toyota U.S.A. is headquartered in Torrance, California and is a subsidiary of Toyota Motor Corporation.

66.     Toyota Motor Engineering & Manufacturing North America, Inc. ("TEMA") is headquartered in Erlanger, Kentucky with major operations in Arizona, California, and Michigan.  TEMA is responsible for Toyota's engineering design and development, research and development, and manufacturing activities in the U.S., Mexico, and Canada.  TEMA is a subsidiary of Toyota Motor Corporation.

67.     Defendants Toyota, Toyota U.S.A., and TEMA are collectively referred to as "Toyota" or the "Toyota Defendants."  Toyota vehicles sold in the United States contain defective airbags manufactured by Takata.  The Toyota Defendants deliver these products into the stream of commerce with the expectation that they will be purchased by consumers and businesses in the United States and the State of Georgia.

## II.     Plaintiff and the Class

### Plaintiff

68.     Road Tested Parts, Inc. d/b/a WeaverParts.com ("Plaintiff" or "Weaver") is an automotive partsrecycler and Georgia corporation with a principal place of business at 774 Highway 320, Carnesville, GA 30521.  Weaver also has a substantial business operation at 9001

Stitt St., Monroe, NC 28110.  Prior to the recalls set forth herein, Weaver purchased Class

Vehicles, as defined below, containing Takata airbags.  Weaver purchased these Takata airbags

for purposes of resale.  Had Weaver known of the Inflator Defect, it would not have purchased

the ClassVehicles or it would not have paid as much for them as it did.

**The Automotive Recycler Classes**

69.    Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a),

(b)(2) and/or (b)(3) on behalf of the following Classes:

> **All automotive recyclers in the United States who, prior to the date**
> **on which a Class Vehicle was recalled, purchased a Class Vehicle**
> **containing an undeployed Takata airbag, and who: (i) still possesses**
> **any such airbag; (ii) sold any such airbag or component of the**
> **airbag module to Takata or the Defendants or an agent or third**
> **party acting on their behalf, after the date on which the Class**
> **Vehicle was recalled; or (iii) destroyed or disposed of any such**
> **airbag, after the date on which the Class Vehicle was recalled (the**
> **"Nationwide Automotive Recycler Class").**

70.    Plaintiff alleges statewide class action claims on behalf of separate classes in

the states of Georgia and North Carolina.  Each of these State Automotive Recycler Classes

is initially defined as follows:

> **All automotive recyclers in each of the above states who, prior to the**
> **date on which a Class Vehicle was recalled, purchased a Class**
> **Vehicle containing an undeployed Takata airbag, and who: (i) still**
> **possess any such airbag; (ii) sold any such airbag or component of**
> **the airbag module to Takata or the Defendants or an agent or third**
> **party acting on their behalf, after the date on which the Class Vehicle**
> **was recalled; or (iii) destroyed or disposed of any such airbag, after**
> **the date on which the Class Vehicle was recalled.**

71.    Automotive recyclers include full service and self-service automotive recyclers,

which remove automotive parts from motor vehicles for disposal or resale to and reuse by

consumers.

72.    The Automotive Recyclers Classes and their members are sometimes referred to herein as the "Class" or "Classes."

73.    Excluded from each Class are Takata and the Defendants, their employees, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliates of Takata and the Defendants; Class Counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case.

## GENERAL FACTUAL ALLEGATIONS

74.    Plaintiff brings this action on behalf of itself and all persons similarly situated who purchased Class Vehicles (defined below).  Plaintiff seeks redress individually and on behalf of those similarly situated for economic losses stemming from Defendants' manufacture or use of Defective Airbags in the Class Vehicles, including but not limited to diminished value of the Defective Airbags and the Class Vehicles and their constituent parts.  Plaintiff, on behalf of itself and those similarly situated, seeks to recover damages and statutory penalties, and injunctive relief/equitable relief.

75.    "Defective Airbags" refers to all airbags (including inflators) manufactured by Takata ("Takata airbags") that are subject to the recalls identified in the table set forth in paragraph 77, *infra*, all Takata airbags subject to recalls relating to Takata's May 18, 2015 DIRs, and all Takata airbags subject to any subsequent expansion of pre-existing recalls, new recalls, amendments to pre-existing DIRs, or new DIRs, announced prior to the date of an order granting class certification, relating to the tendency of such airbags to over-aggressively deploy, rupture, or fail to deploy.  All Defective Airbags contain the Inflator Defect.  As a result of the Inflator Defect, Defective Airbags have an unreasonably dangerous tendency to: (a) rupture and expel

18

metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether.

76. "Class Vehicles" refers to all vehicles purchased in the United States that have Defective Airbags.

77. As detailed in this Complaint, over the course of seven years Takata and the Defendants have issued a series of partial, misleading, and ultimately ineffective recalls to address the Defective Airbags. For reference, the following table identifies the recalled vehicles by manufacturer, and which of the front airbags were included in the recall for each vehicle (driver or passenger):

| Manufacturer | Recall | Make | Model | Model Years | Side(s) |
|---|---|---|---|---|---|
| BMW | 13V172 | BMW | 325Ci | 2002-2003 | Passenger |
| BMW | 13V172 | BMW | 325i | 2002-2003 | Passenger |
| BMW | 13V172 | BMW | 325iT | 2002-2003 | Passenger |
| BMW | 13V172 | BMW | 325xi | 2002-2003 | Passenger |
| BMW | 13V172 | BMW | 325xiT | 2002-2003 | Passenger |
| BMW | 13V172 | BMW | 330Ci Convertible | 2002-2003 | Passenger |
| BMW | 13V172 | BMW | 330Ci Coupe | 2002-2003 | Passenger |
| BMW | 13V172 | BMW | 330i | 2002-2003 | Passenger |
| BMW | 13V172 | BMW | 330xi Sedan | 2002-2003 | Passenger |
| BMW | 13V172 | BMW | M3 Convertible | 2002-2003 | Passenger |
| BMW | 13V172 | BMW | M3 Coupe | 2002-2003 | Passenger |
| BMW | 14V348 | BMW | 325i | 2004-2006 | Both |
| BMW | 14V348 | BMW | 325xi | 2004-2005 | Both |
| BMW | 14V348 | BMW | 330i | 2004-2006 | Both |
| BMW | 14V348 | BMW | 330xi | 2004-2005 | Both |
| BMW | 14V348 | BMW | M3 | 2004-2006 | Both |
| BMW | 14V428 | BMW | 323i | 2000 | Passenger |
| BMW | 14V428 | BMW | 325i | 2001-2006 | Passenger |
| BMW | 14V428 | BMW | 325xi | 2001-2005 | Passenger |
| BMW | 14V428 | BMW | 328i | 2000 | Passenger |
| BMW | 14V428 | BMW | 330i | 2001-2006 | Passenger |

19

| Manufacturer | Recall | Make | Model | Model Years | Side(s) |
|---|---|---|---|---|---|
| BMW | 14V428 | BMW | 330xi | 2001-2005 | Passenger |
| BMW | 14V428 | BMW | M3 | 2001-2006 | Passenger |
| BMW | 15V318 | BMW | 325i/325xi/330i/330xi Sedan | 2002-2005 | Driver |
| BMW | 15V318 | BMW | 325xi/325i Sports Wagon | 2002-2005 | Driver |
| BMW | 15V318 | BMW | 330Ci/325Ci/M3 Convertible | 2002-2006 | Driver |
| BMW | 15V318 | BMW | 325i/330i/M3 Coupe | 2002-2006 | Driver |
| BMW | 15V318 | BMW | M5/540i/525i/530i Sedan | 2002-2006 | Driver |
| BMW | 15V318 | BMW | 540i/525i Sports Wagon | 2002-2003 | Driver |
| BMW | 15V318 | BMW | X5 3.0i/4.4i Sports Activity Vehicle | 2003-2004 | Driver |
| BMW | 16V364 | BMW | X5 | 2007-2011 | Passenger |
| BMW | 16V364 | BMW | X6 | 2008-2011 | Passenger |
| BMW | 16V364 | BMW | X6 ActiveHybrid SAC | 2010-2011 | Passenger |
| BMW | 16V071 | BMW | 1 Series M | 2008-2013 | Driver |
| BMW | 16V071 | BMW | 128i | 2008-2013 | Driver |
| BMW | 16V071 | BMW | 135i | 2008-2013 | Driver |
| BMW | 16V071 | BMW | 325 | 2006-2012 | Driver |
| BMW | 16V071 | BMW | 328 | 2006-2013 | Driver |
| BMW | 16V071 | BMW | 330 | 2006-2011 | Driver |
| BMW | 16V071 | BMW | 335 | 2006-2013 | Driver |
| BMW | 16V071 | BMW | M3 | 2007-2013 | Driver |
| BMW | 16V071 | BMW | X1 SAV | 2013-2015 | Driver |
| BMW | 16V071 | BMW | X3 SAV | 2007-2010 | Driver |
| BMW | 16V071 | BMW | X5 SAV | 2007-2013 | Driver |
| BMW | 16V071 | BMW | X6 ActiveHybrid Sac | 2010-2011 | Driver |
| BMW | 16V071 | BMW | X6 Sac | 2008-2009, 2012-2014 | Driver |
| BMW | 17V020 | BMW | X5 | 2007-2009, 2012 | Passenger |
| BMW | 17V020 | BMW | X6 | 2008-2009, 2012 | Passenger |
| BMW | 17V047 | BMW | 320 | 2000-2002 | Driver |
| BMW | 17V047 | BMW | 323 | 2000-2002 | Driver |
| BMW | 17V047 | BMW | 325 | 2000-2002 | Driver |
| BMW | 17V047 | BMW | 330 | 2000-2002 | Driver |

| Manufacturer | Recall | Make | Model | Model Years | Side(s) |
|---|---|---|---|---|---|
| BMW | 17V047 | BMW | 525 | 2001-2002 | Driver |
| BMW | 17V047 | BMW | 530 | 2001-2002 | Driver |
| BMW | 17V047 | BMW | 540 | 2001-2002 | Driver |
| BMW | 17V047 | BMW | M3 | 2000-2002 | Driver |
| BMW | 17V047 | BMW | M5 | 2000-2002 | Driver |
| BMW | 17V047 | BMW | X5 | 2000-2002 | Driver |
| Chrysler | 14V354 | Chrysler | 300 | 2005-2008 | Both |
| Chrysler | 14V354 | Chrysler | Aspen | 2007-2008 | Both |
| Chrysler | 14V354 | Dodge | Dakota | 2005-2008 | Both |
| Chrysler | 14V354 | Dodge | Durango | 2004-2008 | Both |
| Chrysler | 14V354 | Dodge | Ram 1500 | 2003-2008 | Both |
| Chrysler | 14V354 | Dodge | Ram 2500 | 2005-2008 | Both |
| Chrysler | 14V354 | Dodge | Ram 3500 | 2006-2008 | Both |
| Chrysler | 14V354 | Dodge | Ram 3500 Cab Chassis | 2007-2008 | Both |
| Chrysler | 14V354 | Dodge | Ram 4500 Cab Chassis | 2006-2008 | Both |
| Chrysler | 14V354 | Dodge | Ram 5500 | 2008 | Both |
| Chrysler | 14V770 | Chrysler | 300 | 2005 | Passenger |
| Chrysler | 14V770 | Chrysler | SRT8 | 2005 | Passenger |
| Chrysler | 14V770 | Dodge | Dakota | 2005 | Passenger |
| Chrysler | 14V770 | Dodge | Durango | 2004-2005 | Passenger |
| Chrysler | 14V770 | Dodge | Magnum | 2005 | Passenger |
| Chrysler | 14V770 | Dodge | Ram 1500 | 2003-2005 | Passenger |
| Chrysler | 14V770 | Dodge | Ram 2500 | 2003-2005 | Passenger |
| Chrysler | 14V770 | Dodge | Ram 3500 | 2003-2005 | Passenger |
| Chrysler | 14V817 | Chrysler | 300 | 2005-2007 | Driver |
| Chrysler | 14V817 | Chrysler | 300C | 2005-2007 | Driver |
| Chrysler | 14V817 | Chrysler | Aspen | 2007 | Driver |
| Chrysler | 14V817 | Chrysler | SRT8 | 2005-2007 | Driver |
| Chrysler | 14V817 | Dodge | Charger | 2005-2007 | Driver |
| Chrysler | 14V817 | Dodge | Dakota | 2005-2007 | Driver |
| Chrysler | 14V817 | Dodge | Durango | 2004-2007 | Driver |
| Chrysler | 14V817 | Dodge | Magnum | 2005-2007 | Driver |
| Chrysler | 14V817 | Dodge | Ram 1500 | 2004-2007 | Driver |
| Chrysler | 14V817 | Dodge | Ram 2500 | 2005-2007 | Driver |
| Chrysler | 14V817 | Dodge | Ram 3500 | 2006-2007 | Driver |
| Chrysler | 14V817 | Mitsubishi | Raider | 2006-2007 | Driver |
| Chrysler | 15V312 | Dodge | Ram 1500/2500/3500 | 2003 | Passenger |

| Manufacturer | Recall | Make | Model | Model Years | Side(s) |
|---|---|---|---|---|---|
| Chrysler | 15V313 | Dodge | Ram 2500 Pickup | 2005-2009 | Driver |
| Chrysler | 15V313 | Dodge | Ram 1500 Pickip | 2004-2008 | Driver |
| Chrysler | 15V313 | Dodge | Ram 3500 Pickup | 2006-2009 | Driver |
| Chrysler | 15V313 | Dodge | Ram 3500 Cab Chassis | 2007-2009 | Driver |
| Chrysler | 15V313 | Dodge | Ram 4500/5500 Cam Chassis | 2008-2010 | Driver |
| Chrysler | 15V313 | Sterling | 4500/5500 Cab Chassis | 2008-2009 | Driver |
| Chrysler | 15V313 | Dodge | Durango | 2004-2008 | Driver |
| Chrysler | 15V313 | Chrysler | Aspen | 2007-2008 | Driver |
| Chrysler | 15V313 | Chrysler | 300/300C/SRT8 | 2005-2010 | Driver |
| Chrysler | 15V313 | Dodge | Charger/Magnum | 2005-2010 | Driver |
| Chrysler | 15V313 | Dodge | Dakota | 2005-2011 | Driver |
| Chrysler | 15V313 | Mitsubishi | Raider | 2006-2010 | Driver |
| Chrysler | 15V354 | Freightline | Sprinter 2500/3500 | 2007-2008 | Passenger |
| Chrysler | 15V354 | Dodge | Sprinter 2500/3500 | 2006-2008 | Passenger |
| Chrysler | 15V361 | Sterling | Bullet 4500/5500 Chassis Cab | 2008-2009 | Driver |
| Chrysler | 15V444 | Dodge | Challenger | 2008-2010 | Driver |
| Chrysler | 16V352 | Chrysler | 300 | 2005-2012 | Passenger |
| Chrysler | 16V352 | Chrysler | Aspen | 2007-2009 | Passenger |
| Chrysler | 16V352 | Dodge | Challenger | 2008-2012 | Passenger |
| Chrysler | 16V352 | Dodge | Charger | 2006-2012 | Passenger |
| Chrysler | 16V352 | Dodge | Dakota | 2005-2011 | Passenger |
| Chrysler | 16V352 | Dodge | Durango | 2004-2009 | Passenger |
| Chrysler | 16V352 | Dodge | Magnum | 2005-2008 | Passenger |
| Chrysler | 16V352 | Dodge | Ram 1500 | 2004-2008 | Passenger |
| Chrysler | 16V352 | Dodge | Ram 2500 | 2005-2009 | Passenger |
| Chrysler | 16V352 | Dodge | Ram 3500 | 2006-2009 | Passenger |
| Chrysler | 16V352 | Dodge | Ram 4500 | 2008-2010 | Passenger |
| Chrysler | 16V352 | Dodge | Ram 5500 | 2008-2010 | Passenger |
| Chrysler | 16V352 | Jeep | Wrangler | 2007-2012 | Passenger |
| Chrysler | 16V352 | Mitsubishi | Raider | 2006-2009 | Passenger |
| Chrysler | 16V352 | Dodge | Ram 5500 Cab Chassis | 2008-2010 | Passenger |
| Chrysler | 16V352 | Dodge | Ram 3500 Cab Chassis | 2007-2010 | Passenger |
| Chrysler | 16V947 | Chrysler | Aspen | 2009 | Driver |

| Manufacturer | Recall | Make | Model | Model Years | Side(s) |
|---|---|---|---|---|---|
| Chrysler | 16V947 | Dodge | Durango | 2009 | Driver |
| Chrysler | 16V947 | Dodge | RAM 3500 | 2010 | Driver |
| Ford | 14V343 | Ford | GT | 2005-2006 | Both |
| Ford | 14V343 | Ford | Mustangs | 2005-2008 | Driver |
| Ford | 14V343 | Ford | Ranger | 2004-2005 | Both |
| Ford | 14V787 | Ford | GT | 2005-2006 | Passenger |
| Ford | 14V787 | Ford | Ranger | 2004-2005 | Passenger |
| Ford | 14V802 | Ford | GT | 2005-2006 | Driver |
| Ford | 14V802 | Ford | Mustang | 2005-2008 | Driver |
| Ford | 15V322 | Ford | Ranger | 2004-2006 | Passenger |
| Ford | 15V319 | Ford | Mustang | 2005-2014 | Driver |
| Ford | 15V319 | Ford | GT | 2005-2006 | Driver |
| Ford | 15V322 | Ford | Ranger | 2004-2006 | Passenger |
| Ford | 16V036 | Ford | Ranger | 2004-2006 | Driver |
| Ford | 16V384 | Ford | Edge | 2007-2010 | Passenger |
| Ford | 16V384 | Ford | Ford GT | 2005-2006 | Passenger |
| Ford | 16V384 | Ford | Fusion | 2006-2011 | Passenger |
| Ford | 16V384 | Ford | Mustang | 2005-2011 | Passenger |
| Ford | 16V384 | Ford | Ranger | 2007-2011 | Passenger |
| Ford | 16V384 | Lincoln | MKX | 2007-2010 | Passenger |
| Ford | 16V384 | Lincoln | MKZ | 2006-2011 | Passenger |
| Ford | 16V384 | Lincoln | Zephyr | 2006-2011 | Passenger |
| Ford | 16V384 | Mercury | Milan | 2006-2011 | Passenger |
| Ford | 17V024 | Ford | Edge | 2007-2009 | Passenger |
| Ford | 17V024 | Ford | Fusion | 2006-2009, 2012 | Passenger |
| Ford | 17V024 | Ford | GT | 2005-2006 | Passenger |
| Ford | 17V024 | Ford | Mustang | 2005-2009, 2012 | Passenger |
| Ford | 17V024 | Ford | Ranger | 2007-2009 | Passenger |
| Ford | 17V024 | Lincoln | MKX | 2007-2009 | Passenger |
| Ford | 17V024 | Lincoln | MKZ | 2006-2009, 2012 | Passenger |
| Ford | 17V024 | Lincoln | Zephyr | 2006-2009, 2012 | Passenger |
| Ford | 17V024 | Mercury | Milan | 2006-2009 | Passenger |
| GM | 14V372 | Chevrolet | Cruze | 2013-2014 | Driver |
| GM | 14V471 | Saab | 9-2X | 2005 | Passenger |
| GM/Toyota | 13V133 | Pontiac | Vibe | 2003-2004 | Passenger |

| Manufacturer | Recall | Make | Model | Model Years | Side(s) |
|---|---|---|---|---|---|
| GM | 15V323 | Saab | 9-2X | 2005 | Passenger |
| GM | 15V324 | Chevrolet | Silverado 2500 | 2007-2008 | Passenger |
| GM | 15V324 | Chevrolet | Silverado 3500 | 2007-2008 | Passenger |
| GM | 15V324 | GMC | Sierra 2500 | 2007-2008 | Passenger |
| GM | 15V324 | GMC | Sierra 3500 | 2007-2008 | Passenger |
| GM | 16V063 | Saab | 9-3 | 2006-2011 | Driver |
| GM | 16V063 | Saab | 9-5 | 2006-2009 | Driver |
| GM | 16V063 | Saturn | Astra | 2008-2009 | Driver |
| GM | 16V381 | Cadillac | Escalade | 2007-2011 | Both |
| GM | 16V381 | Cadillac | Escalade ESV | 2007-2011 | Both |
| GM | 16V381 | Cadillac | Escalade EXT | 2007-2011 | Both |
| GM | 16V381 | Chevrolet | Avalanche | 2007-2011 | Both |
| GM | 16V381 | Chevrolet | Silverado 1500 | 2007-2011 | Both |
| GM | 16V381 | Chevrolet | Silverado 2500 | 2009-2011 | Both |
| GM | 16V381 | Chevrolet | Silverado 3500 | 2009-2011 | Both |
| GM | 16V381 | Chevrolet | Suburban | 2007-2011 | Both |
| GM | 16V381 | Chevrolet | Tahoe | 2007-2011 | Both |
| GM | 16V381 | GMC | Sierra 1500 | 2007-2011 | Both |
| GM | 16V381 | GMC | Sierra 2500 | 2009-2011 | Both |
| GM | 16V381 | GMC | Sierra 3500 | 2009-2011 | Both |
| GM | 16V381 | GMC | Yukon | 2007-2011 | Both |
| GM | 16V381 | GMC | Yukon XL | 2007-2011 | Both |
| GM | 16V383 | Cadillac | Escalade | 2007-2008 | Both |
| GM | 16V383 | Cadillac | Escalade ESV | 2007-2008 | Both |
| GM | 16V383 | Cadillac | Escalade EXT | 2007-2008 | Both |
| GM | 16V383 | Chevrolet | Avalanche | 2007-2008 | Both |
| GM | 16V383 | Chevrolet | Silverado 1500 | 2007-2008 | Both |
| GM | 16V383 | Chevrolet | Suburban | 2007-2008 | Both |
| GM | 16V383 | Chevrolet | Tahoe | 2007-2008 | Both |
| GM | 16V383 | GMC | Sierra 1500 | 2007-2008 | Both |
| GM | 16V383 | GMC | Yukon | 2007-2008 | Both |
| GM | 16V383 | GMC | Yukon XL | 2007-2008 | Both |
| Honda | 08V593 | Honda | Accord | 2001 | Driver |
| Honda | 08V593 | Honda | Civic | 2001 | Driver |
| Honda | 09V259 | Acura | TL/CL | 2002 | Driver |
| Honda | 09V259 | Honda | Accord | 2001-2002 | Driver |
| Honda | 09V259 | Honda | Civic | 2001 | Driver |
| Honda | 10V041 | Acura | CL | 2003 | Driver |

| Manufacturer | Recall | Make | Model | Model Years | Side(s) |
|---|---|---|---|---|---|
| Honda | 10V041 | Acura | TL | 2002-2003 | Driver |
| Honda | 10V041 | Honda | Accord | 2001-2002 | Driver |
| Honda | 10V041 | Honda | Civic | 2001-2003 | Driver |
| Honda | 10V041 | Honda | CR-V | 2002 | Driver |
| Honda | 10V041 | Honda | Odyssey | 2002 | Driver |
| Honda | 10V041 | Honda | Pilot | 2003 | Driver |
| Honda | 11V260 | Acura | CL | 2003 | Driver |
| Honda | 11V260 | Acura | TL | 2002-2003 | Driver |
| Honda | 11V260 | Honda | Accord | 2001-2002 | Driver |
| Honda | 11V260 | Honda | Civic | 2001-2003 | Driver |
| Honda | 11V260 | Honda | Civic Hybrid | 2003 | Driver |
| Honda | 11V260 | Honda | CR-V | 2002-2004 | Driver |
| Honda | 11V260 | Honda | Odyssey | 2002-2003 | Driver |
| Honda | 11V260 | Honda | Pilot | 2003 | Driver |
| Honda | 13V132 | Honda | Civic | 2001-2003 | Passenger |
| Honda | 13V132 | Honda | CR-V | 2002-2003 | Passenger |
| Honda | 13V132 | Honda | Odyssey | 2002 | Passenger |
| Honda | 14V349 | Acura | MDX | 2003 | Passenger |
| Honda | 14V349 | Honda | Accord | 2003 | Passenger |
| Honda | 14V349 | Honda | Civic | 2002-2003 | Passenger |
| Honda | 14V349 | Honda | CR-V | 2002-2003 | Passenger |
| Honda | 14V349 | Honda | Element | 2003 | Passenger |
| Honda | 14V349 | Honda | Odyssey | 2002-2003 | Passenger |
| Honda | 14V349 | Honda | Pilot | 2003 | Passenger |
| Honda | 14V351 | Acura | MDX | 2003-2006 | Driver |
| Honda | 14V351 | Acura | TL/CL | 2002-2003 | Driver |
| Honda | 14V351 | Honda | Accord | 2001-2007 | Driver |
| Honda | 14V351 | Honda | Accord | 2001-2002 | Driver |
| Honda | 14V351 | Honda | Civic | 2001-2005 | Driver |
| Honda | 14V351 | Honda | CR-V | 2002-2006 | Driver |
| Honda | 14V351 | Honda | Element | 2003-2011 | Driver |
| Honda | 14V351 | Honda | Odyssey | 2002-2004 | Driver |
| Honda | 14V351 | Honda | Pilot | 2003-2007 | Driver |
| Honda | 14V351 | Honda | Ridgeline | 2006 | Driver |
| Honda | 14V353 | Acura | MDX | 2003-2005 | Passenger |
| Honda | 14V353 | Acura | RL | 2005 | Passenger |
| Honda | 14V353 | Honda | Accord | 2003-2005 | Passenger |
| Honda | 14V353 | Honda | Civic | 2003-2005 | Passenger |

25

| Manufacturer | Recall | Make | Model | Model Years | Side(s) |
|---|---|---|---|---|---|
| Honda | 14V353 | Honda | CR-V | 2003-2005 | Passenger |
| Honda | 14V353 | Honda | Element | 2003-2004 | Passenger |
| Honda | 14V353 | Honda | Odyssey | 2003-2004 | Passenger |
| Honda | 14V353 | Honda | Pilot | 2003-2005 | Passenger |
| Honda | 14V353 | Honda | RidgeLine | 2006 | Passenger |
| Honda | 14V700 | Acura | MDX | 2003-2005 | Passenger |
| Honda | 14V700 | Acura | RL | 2005 | Passenger |
| Honda | 14V700 | Honda | Accord | 2003-2005 | Passenger |
| Honda | 14V700 | Honda | Civic | 2001-2005 | Passenger |
| Honda | 14V700 | Honda | Civic (CNG) | 2003-2004 | Passenger |
| Honda | 14V700 | Honda | Civic Hybrid | 2003-2005 | Passenger |
| Honda | 14V700 | Honda | CR-V | 2002-2005 | Passenger |
| Honda | 14V700 | Honda | Element | 2003-2004 | Passenger |
| Honda | 14V700 | Honda | Odyssey | 2002-2004 | Passenger |
| Honda | 14V700 | Honda | Pilot | 2003-2005 | Passenger |
| Honda | 14V700 | Honda | Ridgeline | 2006 | Passenger |
| Honda | 15V153 | Honda | Accord | 2001 | Driver |
| Honda | 15V153 | Honda | Civic | 2004 | Driver |
| Honda | 15V153 | Honda | Pilot | 2008 | Driver |
| Honda | 15V320 | Honda | Accord | 2001-2007 | Driver |
| Honda | 15V320 | Honda | Civic | 2001-2005 | Driver |
| Honda | 15V320 | Honda | CR-V | 2002-2006 | Driver |
| Honda | 15V320 | Honda | Element | 2003-2011 | Driver |
| Honda | 15V320 | Honda | Odyssey | 2002-2004 | Driver |
| Honda | 15V320 | Honda | Pilot | 2003-2008 | Driver |
| Honda | 15V320 | Honda | Ridgeline | 2006 | Driver |
| Honda | 15V320 | Acura | CL | 2003 | Driver |
| Honda | 15V320 | Acura | MDX | 2003-2006 | Driver |
| Honda | 15V320 | Acura | TL | 2002-2003 | Driver |
| Honda | 15V370 | Acura | MDX | 2003 | Passenger |
| Honda | 15V370 | Honda | Accord | 2003-2007 | Passenger |
| Honda | 15V370 | Honda | Civic | 2001-2005 | Passenger |
| Honda | 15V370 | Honda | Civic GX | 2001-2004 | Passenger |
| Honda | 15V370 | Honda | Civic Hybrid | 2003-2005 | Passenger |
| Honda | 15V370 | Honda | CR-V | 2002-2004 | Passenger |
| Honda | 15V370 | Honda | Element | 2003 | Passenger |
| Honda | 15V370 | Honda | Odyssey | 2002-2003 | Passenger |
| Honda | 15V370 | Honda | Pilot | 2003 | Passenger |

| Manufacturer | Recall | Make | Model | Model Years | Side(s) |
|---|---|---|---|---|---|
| Honda | 16V061 | Acura | ILX | 2013-2016 | Driver |
| Honda | 16V061 | Acura | RDX | 2007-2016 | Driver |
| Honda | 16V061 | Acura | RL | 2005-2012 | Driver |
| Honda | 16V061 | Acura | TL | 2009-2014 | Driver |
| Honda | 16V061 | Acura | ZDX | 2010-2013 | Driver |
| Honda | 16V061 | Honda | CR-V | 2007-2011 | Driver |
| Honda | 16V061 | Honda | CR-Z | 2011-2015 | Driver |
| Honda | 16V061 | Honda | Fit | 2009-2013 | Driver |
| Honda | 16V061 | Honda | Fit EV | 2013-2014 | Driver |
| Honda | 16V061 | Honda | Insight | 2010-2014 | Driver |
| Honda | 16V061 | Honda | Ridgeline | 2007-2014 | Driver |
| Honda | 16V344 | Acura | MDX | 2003-2006 | Passenger |
| Honda | 16V344 | Acura | RL | 2005-2011 | Passenger |
| Honda | 16V344 | Honda | CR-V | 2005-2006 | Passenger |
| Honda | 16V344 | Honda | Element | 2003-2011 | Passenger |
| Honda | 16V344 | Honda | Fit | 2007-2008 | Passenger |
| Honda | 16V344 | Honda | Odyssey | 2002-2004 | Passenger |
| Honda | 16V344 | Honda | Pilot | 2003-2008 | Passenger |
| Honda | 16V344 | Honda | Ridgeline | 2006-2011 | Passenger |
| Honda | 16V346 | Acura | TSX | 2009-2011 | Passenger |
| Honda | 16V346 | Acura | TSX Sportswagon | 2011 | Passenger |
| Honda | 16V346 | Acura | ZDX | 2010-2011 | Passenger |
| Honda | 16V346 | Honda | Accord | 2008-2011 | Passenger |
| Honda | 16V346 | Honda | Accord Crosstour | 2010-2011 | Passenger |
| Honda | 16V346 | Honda | Civic | 2006-2011 | Passenger |
| Honda | 16V346 | Honda | Civic GX | 2006-2011 | Passenger |
| Honda | 16V346 | Honda | Civic Hybrid | 2006-2011 | Passenger |
| Honda | 16V346 | Honda | CR-V | 2007-2011 | Passenger |
| Honda | 16V346 | Honda | FCX Clarity | 2010-2011 | Passenger |
| Honda | 16V346 | Honda | Fit | 2009-2011 | Passenger |
| Honda | 16V346 | Honda | Insight | 2010-2011 | Passenger |
| Honda | 16V346 | Honda | Pilot | 2009-2011 | Passenger |
| Honda | 17V029 | Acura | MDX | 2005-2006 | Passenger |
| Honda | 17V029 | Acura | RL | 2005-2012 | Passenger |
| Honda | 17V029 | Honda | CR-V | 2005-2006 | Passenger |
| Honda | 17V029 | Honda | Element | 2005-2011 | Passenger |
| Honda | 17V029 | Honda | Fit | 2007-2008 | Passenger |

| Manufacturer | Recall | Make | Model | Model Years | Side(s) |
|---|---|---|---|---|---|
| Honda | 17V029 | Honda | Pilot | 2005-2008 | Passenger |
| Honda | 17V029 | Honda | Ridgeline | 2006-2012 | Passenger |
| Honda | 17V030 | Acura | TSX | 2009-2012 | Passenger |
| Honda | 17V030 | Acura | TSX Sportswagon | 2011-2012 | Passenger |
| Honda | 17V030 | Acura | ZDX | 2010-2012 | Passenger |
| Honda | 17V030 | Honda | Accord | 2008-2012 | Passenger |
| Honda | 17V030 | Honda | Accord Crosstour | 2010-2012 | Passenger |
| Honda | 17V030 | Honda | Civic | 2006-2011 | Passenger |
| Honda | 17V030 | Honda | Civic Hybrid | 2006-2011 | Passenger |
| Honda | 17V030 | Honda | CR-V | 2007-2011 | Passenger |
| Honda | 17V030 | Honda | FCX Clarity | 2012 | Passenger |
| Honda | 17V030 | Honda | Fit | 2009-2012 | Passenger |
| Honda | 17V030 | Honda | Insight | 2010-2012 | Passenger |
| Honda | 17V030 | Honda | Pilot | 2009-2012 | Passenger |
| Mazda | 13V130 | Mazda | Mazda6 | 2003-2004 | Passenger |
| Mazda | 13V130 | Mazda | RX-8 | 2004 | Passenger |
| Mazda | 14V344 | Mazda | B-Series | 2004 | Both |
| Mazda | 14V344 | Mazda | Mazda6 | 2003-2008 | Both |
| Mazda | 14V344 | Mazda | MazdaSpeed6 | 2006-2007 | Both |
| Mazda | 14V344 | Mazda | MPV | 2004-2005 | Both |
| Mazda | 14V344 | Mazda | RX-8 | 2004-2008 | Both |
| Mazda | 14V362 | Mazda | Mazda6 | 2003-2004 | Passenger |
| Mazda | 14V362 | Mazda | RX-8 | 2004 | Passenger |
| Mazda | 14V773 | Mazda | B-Series | 2004-2005 | Passenger |
| Mazda | 14V773 | Mazda | Mazda6 | 2003-2006 | Passenger |
| Mazda | 14V773 | Mazda | MPV | 2004-2005 | Passenger |
| Mazda | 14V773 | Mazda | RX-8 | 2004-2005 | Passenger |
| Mazda | 15V345 | Mazda | Mazda 6 | 2003-2008 | Driver |
| Mazda | 15V345 | Mazda | RX-8 | 2004-2008 | Driver |
| Mazda | 15V345 | Mazda | MazdaSpeed 6 | 2006-2007 | Driver |
| Mazda | 15V346 | Mazda | B-Series | 2004-2006 | Passenger |
| Mazda | 15V382 | Mazda | Mazda6 | 2003-2008 | Driver |
| Mazda | 15V382 | Mazda | MazdaSpeed6 | 2006-2007 | Driver |
| Mazda | 15V382 | Mazda | RX-8 | 2004-2008 | Driver |
| Mazda | 15V869 | Mazda | MAZDA6 | 2003-2008 | Passenger |
| Mazda | 15V869 | Mazda | MazdaSpeed6 | 2006-2007 | Passenger |
| Mazda | 15V869 | Mazda | RX-8 | 2004 | Passenger |
| Mazda | 16V048 | Mazda | B-Series Truck | 2004-2006 | Driver |

| Manufacturer | Recall | Make | Model | Model Years | Side(s) |
|---|---|---|---|---|---|
| Mazda | 16V354 | Mazda | Mazda6 | 2003-2008 | Passenger |
| Mazda | 16V354 | Mazda | MazdaSpeed6 | 2006-2007 | Passenger |
| Mazda | 16V354 | Mazda | MPV | 2004-2006 | Passenger |
| Mazda | 16V354 | Mazda | RX-8 | 2004-2011 | Passenger |
| Mazda | 16V356 | Mazda | CX-7 | 2007-2011 | Passenger |
| Mazda | 16V356 | Mazda | CX-9 | 2007-2011 | Passenger |
| Mazda | 16V356 | Mazda | Mazda6 | 2009-2011 | Passenger |
| Mazda | 16V499 | Mazda | B-Series Truck | 2007-2009 | Passenger |
| Mazda | 17V011 | Mazda | MPV | 2005-2006 | Passenger |
| Mazda | 17V011 | Mazda | PX-8 | 2005-2009 | Passenger |
| Mazda | 17V012 | Mazda | CX-7 | 2007-2009, 2012 | Passenger |
| Mazda | 17V012 | Mazda | CX-9 | 2007-2009, 2012 | Passenger |
| Mazda | 17V012 | Mazda | Mazda6 | 2009, 2012 | Passenger |
| Mazda | 17V013 | Mazda | B-Series Truck | 2007-2009 | Passenger |
| Mitsubishi | 14V354 | Mitsubishi | Raider | 2006-2007 | Both |
| Mitsubishi | 14V421 | Mitsubishi | Lancer | 2004-2005 | Passenger |
| Mitsubishi | 14V752 | Mitsubishi | Lancer | 2004-2005 | Passenger |
| Mitsubishi | 15V313 | Mitsubishi | Raider | 2006-2009 | Driver |
| Mitsubishi | 15V321 | Mitsubishi | Lancer/Lancer Evolution | 2004-2006 | Passenger |
| Mitsubishi | 15V321 | Mitsubishi | Lancer Sportback | 2004 | Passenger |
| Mitsubishi | 16V334 | Mitsubishi | Lancer | 2006-2007 | Passenger |
| Mitsubishi | 16V334 | Mitsubishi | Lancer Evolution | 2006-2007 | Passenger |
| Mitsubishi | 17V022 | Mitsubishi | I-MIEV | 2012, 2014 | Passenger |
| Nissan | 13V136 | Infiniti | FX35 | 2003 | Passenger |
| Nissan | 13V136 | Infiniti | FX45 | 2003 | Passenger |
| Nissan | 13V136 | Infiniti | I-30 | 2001 | Passenger |
| Nissan | 13V136 | Infiniti | I35 | 2002-2003 | Passenger |
| Nissan | 13V136 | Infiniti | QX4 | 2002-2003 | Passenger |
| Nissan | 13V136 | Nissan | Maxima | 2001-2003 | Passenger |
| Nissan | 13V136 | Nissan | Pathfinder | 2001-2003 | Passenger |
| Nissan | 13V136 | Nissan | Sentra | 2002-2003 | Passenger |
| Nissan | 14V340 | Infiniti | FX | 2003-2005 | Passenger |
| Nissan | 14V340 | Infiniti | I35 | 2003-2004 | Passenger |
| Nissan | 14V340 | Infiniti | M | 2006 | Passenger |
| Nissan | 14V340 | Nissan | Pathfinder | 2003-2004 | Passenger |
| Nissan | 14V340 | Nissan | Sentra | 2004-2006 | Passenger |

| Manufacturer | Recall | Make | Model | Model Years | Side(s) |
|---|---|---|---|---|---|
| Nissan | 14V701 | Infiniti | FX35 | 2003-2005 | Passenger |
| Nissan | 14V701 | Infiniti | FX45 | 2003-2005 | Passenger |
| Nissan | 14V701 | Infiniti | I35 | 2003-2004 | Passenger |
| Nissan | 14V701 | Infiniti | M35 | 2006 | Passenger |
| Nissan | 14V701 | Infiniti | M45 | 2006 | Passenger |
| Nissan | 14V701 | Nissan | Pathfinder | 2003-2004 | Passenger |
| Nissan | 14V701 | Nissan | Sentra | 2004-2006 | Passenger |
| Nissan | 15V226 | Infiniti | FX35 | 2003-2005 | Passenger |
| Nissan | 15V226 | Infiniti | FX45 | 2003-2005 | Passenger |
| Nissan | 15V226 | Infiniti | I35 | 2003-2004 | Passenger |
| Nissan | 15V226 | Infiniti | M35 | 2006 | Passenger |
| Nissan | 15V226 | Infiniti | M45 | 2006 | Passenger |
| Nissan | 15V226 | Nissan | Sentra | 2006 | Passenger |
| Nissan | 16V349 | Infiniti | FX35 | 2003-2008 | Passenger |
| Nissan | 16V349 | Infiniti | FX45 | 2003-2008 | Passenger |
| Nissan | 16V349 | Infiniti | I30 | 2003-2004 | Passenger |
| Nissan | 16V349 | Infiniti | I35 | 2003-2004 | Passenger |
| Nissan | 16V349 | Infiniti | M35 | 2006-2010 | Passenger |
| Nissan | 16V349 | Infiniti | M45 | 2006-2010 | Passenger |
| Nissan | 16V349 | Nissan | Versa | 2007-2011 | Passenger |
| Nissan | 15V226 | Infiniti | FX35 | 2003-2005 | Passenger |
| Nissan | 15V226 | Infiniti | FX45 | 2003-2005 | Passenger |
| Nissan | 15V226 | Infiniti | I35 | 2003-2004 | Passenger |
| Nissan | 15V226 | Infiniti | M35 | 2006 | Passenger |
| Nissan | 15V226 | Infiniti | M45 | 2006 | Passenger |
| Nissan | 17V028 | Nissan | FX35 | 2005-2008 | Passenger |
| Nissan | 17V028 | Nissan | FX45 | 2005-2008 | Passenger |
| Nissan | 17V028 | Nissan | M35 | 2006-2010 | Passenger |
| Nissan | 17V028 | Nissan | M45 | 2006-2010 | Passenger |
| Nissan | 17V028 | Nissan | Versa | 2007-2009, 2012 | Passenger |
| Nissan | 17V068 | Infiniti | QX4 | 2002 | Passenger |
| Nissan | 17V068 | Nissan | Pathfinder | 2002 | Passenger |
| Subaru | 14V399 | Subaru | Baja | 2003-2004 | Passenger |
| Subaru | 14V399 | Subaru | Impreza | 2004 | Passenger |
| Subaru | 14V399 | Subaru | Legacy | 2003-2004 | Passenger |
| Subaru | 14V399 | Subaru | Outback | 2003-2004 | Passenger |
| Subaru | 14V471 | Subaru | Baja | 2003-2005 | Passenger |

| Manufacturer | Recall | Make | Model | Model Years | Side(s) |
|---|---|---|---|---|---|
| Subaru | 14V471 | Subaru | Impreza | 2004-2005 | Passenger |
| Subaru | 14V471 | Subaru | Legacy | 2003-2005 | Passenger |
| Subaru | 14V471 | Subaru | Outback | 2003-2005 | Passenger |
| Subaru | 14V763 | Saab | 9-2X | 2005 | Passenger |
| Subaru | 14V763 | Subaru | Baja | 2003-2005 | Passenger |
| Subaru | 14V763 | Subaru | Impreza | 2004-2005 | Passenger |
| Subaru | 14V763 | Subaru | Legacy | 2003-2005 | Passenger |
| Subaru | 14V763 | Subaru | Outback | 2003-2005 | Passenger |
| Subaru | 15V323 | Subaru | Impreza Sedan/Station Wagon | 2004-2005 | Passenger |
| Subaru | 15V323 | Subaru | Baja | 2003-2004 | Passenger |
| Subaru | 15V323 | Subaru | Legacy | 2003-2008 | Passenger |
| Subaru | 15V323 | Subaru | Outback | 2003-2008 | Passenger |
| Subaru | 16V358 | Saab | 9-2X | 2006 | Passenger |
| Subaru | 16V358 | Subaru | Baja | 2003-2006 | Passenger |
| Subaru | 16V358 | Subaru | Forester | 2009-2011 | Passenger |
| Subaru | 16V358 | Subaru | Impreza | 2006-2011 | Passenger |
| Subaru | 16V358 | Subaru | Legacy | 2003-2004, 2009-2011 | Passenger |
| Subaru | 16V358 | Subaru | Outback | 2003-3004, 2009-2011 | Passenger |
| Subaru | 16V358 | Subaru | Tribeca | 2006-2011 | Passenger |
| Subaru | 16V359 | Saab | 9-2X | 2006 | Passenger |
| Subaru | 16V359 | Subaru | Baja | 2003-2006 | Passenger |
| Subaru | 16V359 | Subaru | Impreza | 2006-2008 | Passenger |
| Subaru | 16V359 | Subaru | Legacy | 2003-2004 | Passenger |
| Subaru | 16V359 | Subaru | Outback | 2003-2004 | Passenger |
| Subaru | 16V359 | Subaru | Tribeca | 2006-2008 | Passenger |
| Subaru | 16V361 | Subaru | Baja | 2003-2004 | Passenger |
| Subaru | 16V361 | Subaru | Legacy | 2003-2004 | Passenger |
| Subaru | 16V361 | Subaru | Outback | 2003-2004 | Passenger |
| Subaru | 15V323 | Saab | 9-2x | 2005 | Passenger |
| Subaru | 17V014 | Subaru | Baja | 2005-2006 | Passenger |
| Subaru | 17V014 | Subaru | Forester | 2009-2012 | Passenger |
| Subaru | 17V014 | Subaru | Impreza | 2006-2011 | Passenger |
| Subaru | 17V014 | Subaru | Legacy | 2009-2012 | Passenger |
| Subaru | 17V014 | Subaru | Outback | 2009-2012 | Passenger |
| Subaru | 17V014 | Subaru | Tribeca | 2006-2012 | Passenger |
| Subaru | 17V014 | Subaru | WRX | 2012 | Passenger |

| Manufacturer | Recall | Make | Model | Model Years | Side(s) |
|---|---|---|---|---|---|
| Subaru | 17V016 | Saab | 9-2X | 2006 | Passenger |
| Subaru | 17V016 | Subaru | Baja | 2005-2006 | Passenger |
| Subaru | 17V016 | Subaru | Impreza | 2006-2008 | Passenger |
| Subaru | 17V016 | Subaru | Tribeca | 2006-2008 | Passenger |
| Subaru | 17V026 | Subaru | Baja | 2005-2006 | Passenger |
| Subaru | 17V026 | Subaru | Forester | 2009 | Passenger |
| Subaru | 17V026 | Subaru | Impreza | 2006-2009 | Passenger |
| Subaru | 17V026 | Subaru | Legacy | 2009 | Passenger |
| Subaru | 17V026 | Subaru | Outback | 2009 | Passenger |
| Subaru | 17V026 | Subaru | Tribeca | 2006-2009 | Passenger |
| Toyota | 13V133 | Lexus | SC430 | 2002-2004 | Passenger |
| Toyota | 13V133 | Toyota | Corolla | 2003-2004 | Passenger |
| Toyota | 13V133 | Toyota | Matrix | 2003-2004 | Passenger |
| Toyota | 13V133 | Toyota | Sequoia | 2002-2004 | Passenger |
| Toyota | 13V133 | Toyota | Tundra | 2003-2004 | Passenger |
| Toyota | 14V312 | Lexus | SC | 2002-2004 | Passenger |
| Toyota | 14V312 | Toyota | Corolla | 2003-2004 | Passenger |
| Toyota | 14V312 | Toyota | Matrix | 2003-2004 | Passenger |
| Toyota | 14V312 | Toyota | Sequoia | 2002-2004 | Passenger |
| Toyota | 14V312 | Toyota | Tundra | 2003-2004 | Passenger |
| Toyota | 14V350 | Lexus | SC430 | 2003-2005 | Passenger |
| Toyota | 14V350 | Toyota | Corolla | 2003-2005 | Passenger |
| Toyota | 14V350 | Toyota | Matrix | 2003-2005 | Passenger |
| Toyota | 14V350 | Toyota | Sequoia | 2003-2005 | Passenger |
| Toyota | 14V350 | Toyota | Tundra | 2003-2005 | Passenger |
| Toyota | 14V655 | Lexus | SC | 2002-2005 | Passenger |
| Toyota | 14V655 | Toyota | Corolla | 2003-2005 | Passenger |
| Toyota | 14V655 | Toyota | Matrix | 2003-2005 | Passenger |
| Toyota | 14V655 | Toyota | Sequoia | 2002-2005 | Passenger |
| Toyota | 14V655 | Toyota | Tundra | 2003-2005 | Passenger |
| Toyota/GM | 14V312 | Pontiac | Vibe | 2003-2004 | Passenger |
| Toyota/GM | 14V350 | Pontiac | Vibe | 2003-2005 | Passenger |
| Toyota/GM | 14V655 | Pontiac | Vibe | 2003-2005 | Passenger |
| Toyota | 16V127 | Toyota | Corolla | 2008 | Passenger |
| Toyota | 16V127 | Toyota | Corolla Matrix | 2008 | Passenger |
| Toyota | 16V127 | Lexus | SC430 | 2008-2010 | Passenger |
| Toyota | 16V127 | Pontiac | Vibe | 2008 | Passenger |
| Toyota | 16V128 | Toyota | Corolla | 2008 | Passenger |

| Manufacturer | Recall | Make | Model | Model Years | Side(s) |
|---|---|---|---|---|---|
| Toyota | 16V128 | Toyota | Corolla Matrix | 2008 | Passenger |
| Toyota | 16V128 | Lexus | SC430 | 2008-2010 | Passenger |
| Toyota | 16V128 | Pontiac | Vibe | 2008 | Passenger |
| Toyota | 16V340 | Lexus | ES 350 | 2007-2011 | Passenger |
| Toyota | 16V340 | Lexus | GX460 | 2010-2011 | Passenger |
| Toyota | 16V340 | Lexus | IS 250 | 2006-2011 | Passenger |
| Toyota | 16V340 | Lexus | IS 250C | 2010-2011 | Passenger |
| Toyota | 16V340 | Lexus | IS 350 | 2006-2011 | Passenger |
| Toyota | 16V340 | Lexus | IS 350C | 2010-2011 | Passenger |
| Toyota | 16V340 | Lexus | IS F | 2008-2011 | Passenger |
| Toyota | 16V340 | Toyota | 4Runner | 2010-2011 | Passenger |
| Toyota | 16V340 | Toyota | Corolla | 2009-2011 | Passenger |
| Toyota | 16V340 | Toyota | Corolla Matrix | 2009-2011 | Passenger |
| Toyota | 16V340 | Toyota | Sienna | 2011 | Passenger |
| Toyota | 16V340 | Toyota | Scion xB | 2008-2011 | Passenger |
| Toyota | 16V340 | Toyota | Yaris Hatchback | 2006-2011 | Passenger |
| Toyota | 16V340 | Toyota | Yaris Sedan | 2007-2011 | Passenger |
| Toyota | 16V340 | Pontiac | Vibe | 2009-2010 | Passenger |
| Toyota | 17V006 | Lexus | ES 350 | 2007-2009, 2012 | Passenger |
| Toyota | 17V006 | Lexus | GX460 | 2012 | Passenger |
| Toyota | 17V006 | Lexus | IS 250 | 2006-2009, 2012 | Passenger |
| Toyota | 17V006 | Lexus | IS 250C | 2012 | Passenger |
| Toyota | 17V006 | Lexus | IS 350 | 2006-2009, 2012 | Passenger |
| Toyota | 17V006 | Lexus | IS 350C | 2012 | Passenger |
| Toyota | 17V006 | Lexus | IS F | 2008-2009, 2012 | Passenger |
| Toyota | 17V006 | Lexus | LFA | 2012 | Passenger |
| Toyota | 17V006 | Toyota | 4Runner | 2012 | Passenger |
| Toyota | 17V006 | Toyota | Corolla | 2009, 2012 | Passenger |
| Toyota | 17V006 | Toyota | Corolla Matrix | 2009, 2012 | Passenger |
| Toyota | 17V006 | Toyota | Sienna | 2012 | Passenger |
| Toyota | 17V006 | Toyota | Yaris Hatchback | 2007-2009 | Passenger |
| Toyota | 17V006 | Toyota | Yaris Sedan | 2007-2009, 2012 | Passenger |
| Toyota | 17V006 | Pontiac | Vibe | 2009 | Passenger |

33

**I.      Defendants Used Takata Airbags Which Have A Common, Uniform Defect**

78.      Takata has supplied airbags to automakers for U.S. vehicles and to state and local governmental purchasers since at least 1983.  By 2014, Takata had captured 22 percent of the global automotive airbag market.

**A.  Takata Recklessly Chose An Inexpensive and Dangerous Propellant That Defendants Approved for Use**

79.      The part of the airbag at issue in this matter is the inflator. The inflator consists of a metal canister loaded with propellant wafers or pellets, and is placed in the airbag module. Upon impact, the propellant wafers or pellets ignite, triggering a chemical reaction that produces gas, which in turn inflates the fabric airbag.  This process occurs within milliseconds.

80.      The following basic illustration, included earlier in the complaint as well, depicts Takata's airbag module:



81.     When it began manufacturing airbags in the 1980s, Takata used a compound called sodium azide as the propellant within its inflators.  In the mid-1990s, Takata began using a different propellant called 5-aminotetrazole, in part due to toxicity issues associated with sodium azide.

82.     In  the late-1990's, Takata's managers pressured its engineers in Michigan to devise a lower cost propellant based upon ammonium nitrate, a compound used in fertilizer and explosives.  Ammonium nitrate is a dangerous material that should not be used in airbags.  It is an inherently volatile and unstable chemical.

83.     Daily temperature swings are large enough for the ammonium nitrate to cycle through three of its five crystalline states, adding to its volatility.  It also readily absorbs moisture from the atmosphere.  The chemical's sensitivity to temperature and moisture cause it to break down over time, which in turn results in violent detonation or the chemical becoming effectively inert.  As one explosives expert bluntly stated in *The New York Times*, ammonium nitrate "shouldn't be used in airbags," and is better suited to large demolitions in mining and construction.

84.     From the time it began investigating ammonium nitrate in the late 1990s, Takata understood these risks.  Indeed, Takata expressed concern in a patent document in 1995 that an ammonium nitrate propellant would be vulnerable to temperature changes and that its casing "might even blow up."  Takata further recognized that "[o]ne of the major problems with the use of ammonium nitrate is that it undergoes several crystalline phase changes," one of which occurs at approximately 90 degrees Fahrenheit.  If ammonium nitrate undergoes this type of temperature change, the compound may "expand and contract and change shape resulting in growth and

35

cracking" of the propellant, which might cause an airbag inflator to "not operate properly or might even blow up because of the excess pressure generated."

85.     Takata further admitted in a patent document from 1999 that pure ammonium nitrate is "problematic" because many gas generating compositions made with it are "thermally unstable."

86.     In 1999, as the ammonium nitrate design was being considered, Takata's engineering team in Moses Lake, Washington, raised objections and pointed to explosives manuals that warned of the risk of disintegration and irregular, overly-energetic combustion.  As one former Takata engineer noted, "ammonium nitrate stuck out like a sore thumb," and yet his team was given only "a couple days" to do its review.

87.     Not surprisingly, other major airbag manufacturers, including Autoliv, Key Safety Systems, and TRW Automotive, have reportedly avoided using ammonium nitrate as a propellant.  Indeed, Takata's representative confirmed at a recent Congressional hearing that Takata is the only major airbag manufacturer that uses ammonium nitrate as a primary propellant in its inflators.

88.     The only conceivable advantage to the compound for an airbag manufacturer, according to the expert quoted in *The New York Times*, is that it is "cheap, unbelievably cheap." Indeed, Takata had originally planned to use tetrazole as its propellant, which is not only more stable than ammonium nitrate, but also yields other desired benefits, such as being more environmentally friendly.  But tetrazole was too expensive for Takata, and executives ultimately pressured engineers in Michigan to develop a cheaper alternative.

89.     Takata began receiving complaints regarding the Inflator Defect shortly after introducing the redesigned airbag to the market, and those complaints continued to multiply over

the years.  Nevertheless, rather than switch to the compound it knew would be safer, even if more expensive, Takata recklessly opted to try, over the course of many years, to stabilize a compound that resists stabilization.

90.    For example, in a 2006 patent application, Takata discussed the need to test the performance of ammonium nitrate at various extreme temperatures because it is an unstable chemical, and these tests could reveal many problems, including "over-pressurization of the inflator leading to rupture."  The 2006 patent document purportedly contained a fix for that sort of rupturing.

91.    Notably, the alleged fix in 2006 came *after* a rupture incident in 2004 that caused an injury, and incidents continued to mount after that time as well.  Takata submitted a patent application with other purported "fixes" as recently as 2013.  These ongoing, albeit unsuccessful, efforts show that Takata knew throughout the relevant period that its airbags were defective.

## B.    Takata's Knowledge of the Inflator Defect

92.    Takata became further aware of the instability of its ammonium nitrate propellant from the persistent and glaring quality control problems it encountered in its manufacturing operations.  The Takata plants that manufactured the airbags and inflators at issue in this Complaint include plants located in Moses Lake, Washington, LaGrange, Georgia, and Monclova, Mexico.

93.    At a House hearing in December 2014, Mr. Hiroshi Shimizu, Takata's Senior Vice President for Global Quality Assurance, admitted: "We considered it a main contribution to the problem is [sic] the high temperature and absolute humidity, together with age of the products and probably maybe a combination with manufacturing issues."  Nonetheless, Mr. Shimizu claimed that Takata still had not determined the root cause of the defect: "At this

moment, we don't have the root cause.  We know the factors may contribute to this problems [sic], so that is why we are still researching these inflators collected from regions."  Executive Vice President of Honda North America, Rick Schostek, echoed that claim at the House hearing: "we have theories, but we don't know the cause."

94.    Mr. Shimizu grossly understated the problem.  Starting in 2001, engineers at Takata's Monclova, Mexico plant identified a range of problems, including rust, which they said could have caused inflators to fail.    Between 2001 and 2003, Takata struggled with at least 45 different inflator problems, according to dozens of internal reports titled "potential failures" and reviewed by *Reuters*.

95.    On at least three occasions between 2005 and 2006, Takata engineers struggled to eliminate leaks found in inflators, according to engineering presentations.  In 2005, Shainin, a U.S. consulting firm, found a pattern of additional problems.  Underscoring Takata's reckless use of the volatile and unstable ammonium nitrate, on March 31, 2006, the Monclova, Mexico plant was rocked by violent explosions in containers loaded with propellant, leaving at least a dozen workers injured.

96.    Apparently, not even that terrible accident could prompt serious and lasting improvements: in a February 2007 email to multiple colleagues, one manager stated that "[t]he whole situation makes me sick," referring to Takata's failure to implement checks it had introduced to try to keep the airbags containing the unstable and volatile ammonium nitrate propellant from failing.

97.    Takata engineers also scrambled as late as 2009 to address its propellant issues after "inflators tested from multiple propellant lots showed aggressive ballistics," according to an internal presentation in June 2009.

98.    Based on internal Takata documents, Takata was struggling to meet a surge in demand for its airbags.  Putting profits ahead of safety, Takata exhibited shoddy and reckless behavior in the handling of its ammonium nitrate propellant.  In March 2011, a Takata supervisor at the Monclova, Mexico plant sent an e-mail to other employees stating "A part that is not welded = one life less, which shows we are not fulfilling the mission." The title of the e-mail was "Defectos y defectos y defectos!!!!"This shoddy and reckless attitude permeated all of Takata's operations and facilities.

99.    Yet, handling problems at Takata facilities persisted: another manager urged employees to examine the propellant visible in a cross section of an airbag inflator, noting that "[t]he propellant arrangement inside is what can be damaged when the airbags are dropped. . . . Here you can see why it is important to handle our product properly."  A 2009 presentation of guidelines on handling inflators and airbag units also stressed the dangers of mishandling them. The presentation included a link to a video that appeared to show side-curtain airbags deploying violently, sending the inflator hurtling into the car's cabin.

100.    Despite knowing it was shipping potentially deadly products, including inflators containing unstable and volatile ammonium nitrate propellant, Takata resisted taking back damaged or wet airbag modules, in part because Takata struggled to keep up with a surge in demand for its airbags through the early and mid-2000s as it won big new clients like General Motors.

101.    Moreover, Takata has now admitted that replacement airbags placed in recalled vehicles are defective as well, and cannot assure the public that replacement inflators containing ammonium nitrate are safe and not prone to rupture.

## II.    Takata Airbag Failures and Defendants' Inadequate Reaction

### A.    2003-2008: Early Incidents andthe 2008 Honda Recall (08V-593)

102.    Honda was among the first automakers to use Takata's new air bags, and installed them in some models beginning in 1998.  Since then, Takata airbags containing the Inflator Defect have been installed in vehicles manufactured by at least ten automakers.

103.    On November 1, 2003, Charlene Weaver of Arizona—one of the least humid states in the country—was a passenger in a 2004 Subaru Impreza when she was killed in a Takata airbag-related accident.  As summarized in a later section of this Complaint, her car was not recalled until May 2015, more than a decade later.

104.    Also in 2003, an inflator ruptured in a BMW in Switzerland, prompting a January 2004 investigation by Takata and BMW.  That investigation took place at a Takata facility in Michigan, and involved inflators sold to BMW, Honda, and Toyota.  The testing was ordered by a senior Takata executive, and the results indicated that the inflators were defective.

105.    In 2004, a Takata airbag violently exploded in a Honda Accord in Alabama, shooting out metal fragments and injuring the car's driver.  Honda was notified of the incident, and at least one Takata employee recalled being told that Honda examined the part before turning it over to Takata.  Takata reported back to Honda that it was unable to find a cause for the incident.  Ultimately, the companies deemed the incident "an anomaly," and conducted no further investigation or analysis to the public's knowledge.  Notably, Honda and Takata did not issue a recall or even involve federal safety regulators beyond completing a reporting form in a cursory and incomplete manner.

106.    Yet, by this time, Takata was aware of the broad problems associated with its choice of the unstable and volatile ammonium nitrate as a propellant.  As noted above, between 2001 and 2003, internal Takata reports titled "potential failures" showed that Takata struggled

with at least 45 different inflator problems, and that, in 2002, the Monclova, Mexico plant recorded 60 to 80 defects for every million inflators shipped to automakers—six to eight times beyond Takata's own quality control limit.  In light of this accumulated knowledge, Takata's dismissal of the explosion as an anomaly without further study was reckless at best.

107.    Even as it downplayed the incident publicly, engineers at Takata's American headquarters in Auburn Hills, Michigan, began conducting secret tests on 50 airbags it had retrieved from scrapyards.  The tests were conducted by Al Bernat, Takata's then-vice president of engineering, and took place over weekends and holidays during the summer of 2004.

108.    Steel inflators in at least two of the airbags cracked during the tests, a condition which can lead to rupture.  The result was so startling that engineers began designing possible fixes in anticipation of a recall.

109.    But Takata executives ordered the lab technicians to delete the test data, including video and computer backups, from company computers and to dispose of the airbag inflators. Prototypes of design alternatives were also trashed.  One former Takata employee stated that "[a]ll the testing was hush-hush. . . . Then one day, it was, 'Pack it all up, shut the whole thing down.'  It was not standard procedure."

110.    Takata did not disclose these tests to the public or federal regulators.  In regulatory filings, Takata has stated instead that it began testing Defective Airbags in 2008. Because Honda and Takata agreed to describe the 2004 incident in Alabama as an "anomaly," and because Honda and Takata were communicating about the defective inflators by 2004, Plaintiff alleges, upon information and belief, that Honda was aware of Takata's secret testing that occurred shortly after the Honda airbag explosion.

111.     In June and August of 2007, Honda notified Takata of three additional airbag explosion incidents.  All three accidents involved metal fragments propelling into the faces and bodies of car passengers upon deployment of the airbags.  As with the 2004 incident, Honda did not initiate a recall or provide information about the ruptures to federal investigators.  Rather, it callously risked vehicle occupants' safety as it purportedly awaited a failure mode analysis being conducted by Takata.

112.     After the 2007 incidents, Honda and Takata began another internal investigation, including a survey of inflators.  Starting in late 2007 or early 2008, Honda began collecting inflators returned to dealers for reasons unrelated to the exploding-airbag defect, and sent them to Takata for investigation, all without informing vehicle owners or regulators.  Honda also collected inflators from scrap yards for the same purpose.

113.     Takata began what became a year-long study of the Inflator Defect. Takata's engineers ultimately claimed that workers at a Takata factory in Monclova, Mexico, had left moisture-sensitive explosives out on the plant floor, making them prone to overly energetic combustion.  Takata advised Honda that by November 2002, it had corrected any such handling deficiencies.

114.     The victims of the four Honda incidents – one in 2004 and three in 2007 – brought legal claims against Honda, which the automaker settled on a strictly confidential basis. While Honda filed a standard report with U.S. safety regulators for each of these four incidents, its reports tellingly omitted the most critical detail of these incidents: the Defective Airbags posed a substantial risk of serious injury or death when deployed.  In later submissions to NHTSA, Honda admitted that it had received still other complaints in this timeframe:

      a.      On July 25, 2008, Honda received an unidentified complaint related to Takata driver airbag ruptures.

      b.      On September 11, 2008, Honda received notice of a complaint regarding "unusual" driver airbag deployment.

115.    Takata shared the results of the inflator survey analysis with Honda on October 2, 2008. That analysis indicated an airbag inflator problem. Honda and Takata claimed, however, that only a small number or inflators were affected.

116.    As a result, Honda issued a recall, but only for 3,940 vehicles in the United States. This November 2008 recall involved certain 2001 Honda Accord and Civic vehicles with airbags that "could produce excessive internal pressure," causing "the inflator to rupture," spraying metal fragments through the airbag cushion ("2008 Recall").  Honda reported that it learned of the problem from a June 2007 claim, and falsely assured regulators that it had identified all "possible vehicles that could potentially experience the problem."

117.    Even as Takata and Honda advocated a minuscule recall focused on older models—less than 0.1 percent of the total Honda recall to date—at about the same time, in April 2009, Takata engineers scrambled to repair a flaw in a machine at the Monclova, Mexico factory that made the airbag propellant more volatile, according to materials from a company presentation given that year.

**B.**    **2008-2009: Additional Incidents, the 2009 Honda Recall (09V-259), and Honda's andTakata's Misleading Reporting toNhtsa**

118.    Additional incidents took place after the 2008 Recall that underscored its inadequacy:

      a.      On April 27, 2009, six months after the limited 2008 recall, a Takata airbag in Jennifer Griffin's 2001 Honda Civic exploded after a minor accident in Orlando,

Florida.  The explosion sent a two-inch piece of shrapnel from the Defective Airbag flying into

Ms. Griffin's neck.  Although Ms. Griffin survived, when highway troopers found her, she was

bleeding from a severe gash in her neck.  Ms. Griffin's car was not part of the 2008 Recall.

Honda received notice of the incident no later than September 2009, and likely months earlier in

July towards the beginning of its correspondence with NHTSA regarding the upcoming 2009

Recall.

b.      On May 28, 2009, 18-year-old Ashley Parham of Oklahoma was killed

while driving a 2001 Honda Accord when the Takata airbag in her car exploded after her car

bumped another car in a parking lot.  While she apparently survived the accident itself, the metal

shrapnel that shot out of the exploding Defective Airbag sliced open her carotid artery and she

bled to death.  Ms. Parham's car was not part of the 2008 Recall.

c.      Another Takata airbag-related incident took place in Virginia on June 9,

2009, and Honda ultimately settled a lawsuit brought by the decedent's family.

d.      According to one of its submissions related to the upcoming 2009 Recall,

Honda received three additional Takata airbag unusual deployment complaints on July 27, July

31, and August 31, 2009.

119.    With incidents mounting, Takata and Honda revisited the issue yet again.  In

June 2009, Takata reported to Honda that the defective airbag components had been made at its

factory in Moses Lake, Washington.  At the time, Takata engineers claimed that between 2000

and 2002, a flaw in a machine that presses air bag explosives into wafers had made the

explosives unstable.  The Takata engineers further claimed that with the defective air bags,

explosives in the metal inflator, which would normally burn down and produce the nitrogen gas

to inflate the air bag, instead burn aggressively and cause the inflator to burst, shooting hot fragments through the air bag's fabric.

120.     After two years of investigation, Honda and Takata claimed that a machine at Takata's Moses Lake factory in Washington state had failed to compress chemicals firmly enough.  That left the inflators vulnerable to moisture, potentially causing the bags to inflate more forcefully than they were supposed to.  At that time, Takata also acknowledged that the defect covered a wider range of vehicles than initially estimated, but claimed that the plant had made numerous upgrades to its machinery in late 2002, which it claimed had improved the quality of its explosives.

121.     In June 2009, Takata provided a follow up report to Honda on its November 2008 analysis, stating that issues related to propellant production appeared to have caused the improper inflator performance.

122.     As a result of Takata's June 2009 follow-up report and the additional claims of "unusual deployments," on June 30, 2009, Honda issued another recall, this one covering 2001 and 2002 Civic, Accord, and Acura vehicles ("2009 Recall").  Thus, it was two months *after* Ms. Parham's death that Honda expanded its 2008 Recall to include the model she drove.

123.     In August 2009, NHTSA's Recall Management Division sent Honda an information request to explain why it did not include 2009 Recall vehicles in the 2008 Recall, and "to evaluate the timeliness of [Honda's] recent defect decision."

124.     NHTSA also wanted to know "the difference between the driver's airbag inflators in those vehicles from the inflators in the 09V-259 vehicles and explain how this distinction, or any other between the two sets of vehicles, convinced [Honda] at the time that it did not need to include the latter set in the 08V-593 recall population."

125.    NHTSA's Recall Management Division further requested that Honda provide complaints, lawsuits, warranty claims, and field reports, along with an explanation of the "unusual driver airbag deployments" and Honda's investigative efforts.

126.    In Honda's September 16, 2009 reply to NHTSA, the automaker said that its information about the "unusual driver airbag deployments" came from Takata: "[w]e understood the causal factors to be related to airbag propellant due to handling of the propellant during airbag inflator module assembly."

127.    Honda also reported, based on information from Takata, that the problem with the airbags was isolated to the "production of the airbag propellant prior to assembly of the inflators."  Specifically, the cause was "related to the process of pressing the propellant into wafers that were later installed into the inflator modules," and limited to "a specific production process" involving one high-precision compression press that was used to form the propellant into wafers, the automaker told NHTSA.

128.    Honda also disclosed to NHTSA that it had fielded nine complaints and one lawsuit related to the 2008 and 2009 Recalls. Honda also finally informed NHTSA about the 2004 incident involving an "unusual deployment" of the vehicle's airbag. Honda claimed that it "only recently [was] reminded of this incident," and that, until recently, Honda "had not associated it with the [2008 Recall] campaign."

129.    Through a November 20, 2009 request, NHTSA also sought information from Takata.  Takata submitted a partial response to NHTSA on December 23, 2009 ("Partial Response"), and then a full response on February 19, 2010 ("Full Response").  Both responses provided vague and misleading information about the seriousness of the problem.

130.    Takata claimed that there were no substantive design differences between the inflators in the airbags at issue in the two recalls, but cited differences in the production processes between the lots.

131.    Takata also claimed that the defects only existed in specific lots manufactured between certain dates.  It claimed that the inflators involved in the 2008 Recall were manufactured between October 29, 2000 and December 1, 2000, and that inflators involved in the 2009 Recall were manufactured between August 23, 2000 and February 25, 2001.  Takata did not provide the dates the inflators were shipped, as NHTSA requested, because, as Takata admitted, its records did not have that information.  Instead, it gave just the manufacturing dates.

132.    In its Full Response, Takata claimed that the defect identified in the 2009 Recall was the result of a single compression press (the "Stokes press") in a single plant.  Takata further claimed that while it did manufacture 2,400 inflators using the same process as the defective inflators, the design was different and "[t]herefore, Takata is convinced that the inflators sold [redacted] contain no safety-related defect."

133.    Takata falsely wrote in its Full Response that it "believed - [redacted] - that expanding the recall to include all vehicles equipped with inflators manufactured with Stokes propellant produced through and including February 28, 2001 would capture all inflators with tablets that had a risk of producing overly energetic combustion. This recommendation, as well as the analysis that supported it, was presented to Honda on June 12, 2009."

134.    In both the Partial Response and the Full Response, Takata stated: "Takata has not provided any airbag inflators that are the same or substantially similar to the inflators in vehicles covered by Recalls 08V-593 [in 2008] and 09V-259 [in 2009] to any customers other than

47

Honda.  The physical characteristics of the inflator housing used in the Honda vehicles subject to these recalls are unique to Honda."  This statement would prove to be false.

135.    Based on Takata's and Honda's misrepresentations and omissions concerning the nature and scope of the Inflator Defect, NHTSA closed its investigation into the Takata airbags on May 6, 2010.

136.    In the months following NHTSA's 2009/2010 request for information, Takata engineers came up with yet another purported explanation for the ruptures; specifically, that in September 2001, machine operators at the Moses Lake, Washington plant could have inadvertently switched off an "auto reject" function that weeded out poorly made explosives that can become unstable.  However, Takata assured Honda at the time that, as part of the upgrades at that plant, in September 2002, the supplier had added a locking mechanism that prevented workers from turning the auto-reject function off.

137.    The *Wall Street Journal* further reported that "Honda and Takata discovered more problems.  At Moses Lake, employees had switched off a mechanism that automatically checked whether the right amount of propellant was loaded in inflators; at a plant in Monclova, Mexico, a dehumidifier that kept parts dry hadn't been turned on. At times poor record-keeping meant Honda and Takata couldn't figure out which cars had defective bags."

C.    **2010: The 2010 Recall (10v-041) and Honda's Shifting Explanations**

138.    Honda's and Takata's ongoing cover-up and ineffective recalls continued to cost lives.  In December 2009, a 2001 Honda Accord driven by Gurjit Rathore, 33, hit a mail truck in Richmond, Virginia.  Her air bag exploded, propelling shrapnel into her neck and chest, and she bled to death in front of her three children, according to a lawsuit filed by her family.

139.    In February 2010, only months after its previous recall, Honda announced a third recall for an additional 379,000 vehicles across a number of models ("2010 Recall").

48

140.    Honda's explanation for the airbag defect changed yet again, but still misleadingly focused on the manufacturing process.  Honda explained that of the two different manufacturing processes used in the preparation of an airbag propellant, one process was within specification and the other was not.  Honda's expanded recall supposedly reached those vehicles employing airbags that had utilized manufacturing processes not within specification.

141.    Once again, however, injuries continued to mount:

a.    In April 2010, two months after the 2010 Recall, the Takata airbag in Kristy Williams's 2001 Honda Civic exploded while she was stopped at a traffic light in Morrow, Georgia, sending metal shards into her neck and causing profuse bleeding.She survived only because she applied pressure with her fingers to stem the arterial bleeding.

b.    On November 8, 2010, Suetania Emmanuel of St. Croix, U.S. Virgin Islands, was driving a 2002 Honda Civic when the Takata airbag exploded and sent shards of metal into her face and throat.

**D.    2011-2012: Mounting Honda Recalls, Including the 2011 Recall (11V-260)**

142.    In April 2011, Honda filed a Part 573 Defect and Noncompliance report for 2,430 replacement service part airbag modules that might have been installed in vehicles covered by previous recall expansions ("2011 Recall").  Honda was unable to determine which vehicles contained the defective replacement parts, forcing it to recall all 833,277 vehicles that might have had the part installed.

143.    According to documents submitted with the 2011 Recall, on August 15, 2011, Honda became aware of an August 1, 2011 "energetic deployment of a driver's airbag inflator that was outside of the prior range of suspect inflators."  On September 2, 2011, Honda and Takata began an analysis of these so-called "outside of range" occurrences.

49

144.    Further underscoring the instability of the ammonium nitrate propellant, on or about September 14, 2011, Honda and Takata began investigating the possibility that airbag inflator propellant lots were mixed during airbag inflator assembly, prompting further analysis of airbag inflator production records for the period when propellant was processed by the suspect method.

145.    Honda reported its death and injury tallies to regulators only in a confidential submission in December 2011, when it issued a fifth limited recall for the rupture defect, according to NHTSA.  That recall expanded Recall No. 11V-260 (April 2011), to include an additional 272,779 Honda and Acura vehicles.  The expanded recall also included another 640 airbags sold as replacement parts; however, because Honda could not determine on which vehicles the 640 replacement air bags were installed, an additional 603,241 vehicles had to be recalled.  Collectively, 1.7 million Honda and Acura vehicles had been recalled by the end of 2011 because they contained Takata-manufactured airbags.

146.    In the meantime, Honda and Takata quietly continued their internal investigation into the Inflator Defect.  According to Honda, an exploding airbag in Puerto Rico in October 2011 prompted Honda to ask permission from NHTSA to collect "healthy" airbag modules to see if "abnormal combustion was possible."  The collection began on March 14, 2012, and by November 21, 2012, Honda in fact found that even its so-called "healthy" airbags could abnormally combust in certain conditions.

147.    Notably, in or about December 2012, NHTSA's Office of Defects Investigation ("ODI") notified Honda that there were numerous injury or death incidents listed on a spreadsheet Honda provided to NHTSA in connection with NHTSA's Takata investigation that were *not* previously provided to NHTSA under the early warning reporting system established

by the TREAD Act.In late 2014, Honda ultimately admitted that it failed to report 1,729 serious accidents resulting in injuries or deaths to NHTSA between 2003 and 2014. Eight of these incidents involved Takata airbags. In January 2015, Honda agreed to pay a $70 million fine for this startling failure.

148.    Toyota also received additional direct notice of the Inflator Defect in this timeframe. Starting in September 2012, Toyota received field reports of three U.S. vehicles with fractured inflators—two were front passenger side airbags that deployed inadvertently. Toyota recovered 144 in-use inflators from both the Japan and U.S. markets for Takata to evaluate. In February 2013, Takata informed Toyota that some of the propellant wafers found within the recovered inflators were cracked, possibly due to lower material density.

149.    Dangerous and tragic incidents continued to mount during this period.

a.    On April 20, 2011, an unidentified man was hurt in Puerto Rico when the Takata driver airbag ruptured in his 2001 Honda Accord LX. His attorney notified NHTSA on May 26, 2011.

b.    On September 20, 2011, Eddie Rodriguez crashed his Honda Civic in Puerto Rico, deploying airbags that launched sharp pieces of metal toward him. Honda reached a confidential settlement with the driver in 2013.

c.    On October 20, 2011, there was an alleged rupture of a passenger side airbag in Puerto Rico; Honda obtained the vehicle for analysis on February 3, 2012.

d.    On December 4, 2011, Miranda Perez suffered left eye blindness due to a Defective Airbag rupture while driving her 2003 BMW M3 in Buffalo, New York.

e.    On March 2, 2012, Angelina Sujata suffered chest injuries due to a Takata airbag rupture while driving her 2001 Honda Civic in Chapin, South Carolina.

f.    On March 8, 2012, Sharonda Blowe of Jacksonville, Florida was severely injured while driving a 2001 Honda Accord when she was struck in the head by pieces of metal exploding out of a Defective Airbag.  Ms. Blowe brought suit and reached a confidential settlement.

g.    On September 2, 2012, Monique Roig suffered facial injuries due to a Defective Airbag rupture while riding in a 2001 Honda Civic in Miami-Dade County, Florida.

**E.    2013-2014: Takata's Belated Admissions of Broader Defects and the 2013 Recall (13V-132)**

150.    By 2013, it became clear to federal regulators and Defendants were already aware that the Defective Airbag issue, and the number of Defective Airbags, was much more significant than Takata or Honda initially reported to NHTSA.

151.    On February 8, 2013, NHTSA and Honda met to discuss the "ongoing investigation" into Honda's defective Takata airbags.  By March 6, 2013, Honda claimed that:

> A recreation of propellant production using the same methods as were used during 2001-2002 production periods indicated that it was possible for propellant produced during 2001-2002 to be manufactured out of specification without the manufacturing processes correctly identifying and removing the out of specification propellant. Separately, Honda was informed by the supplier of another potential concern related to airbag inflator production that could affect the performance of these airbag modules.

152.    In February and March 2013, Takata notified Nissan and Mazda that it was investigating airbag quality.  Separately, Takata advised Honda "of another potential concern related to airbag inflator production that could affect the performance of these airbag modules."

153.    On April 10, 2013, Honda filed a Recall Notification ("2013 Recall") for an additional 561,422 vehicles that could be affected by the following part defect:

**Defect description:**

In certain vehicles, the passenger's (frontal) airbag inflator could produce

excessive internal pressure. If an affected airbag deploys, the increased internal pressure may cause the inflator to rupture. In the event of an inflator rupture, metal fragments could be propelled upward toward the windshield, or downward toward the front passenger's foot well, potentially causing injury to a vehicle occupant.

154.    On April 11, 2013, Takata filed a Defect Information Report titled "Certain Airbag Inflators Used as Original Equipment." In that report, Takata misleadingly attributed the defect to isolated manufacturing flaws, describing the Defective Airbags as follows:

> Some propellant wafers produced at Takata's plant in Moses Lake, Washington, between April 13, 2000 and September 11, 2002 may have been produced with an inadequate compaction force. . . . In addition some propellant wafers used in inflators produced at Takata's plant in Monclova, Mexico between October 4, 2001 and October 31, 2002, may have been exposed to uncontrolled moisture conditions. Those wafers could have absorbed moisture beyond the allowable limits . . . . In both cases, the propellant could potentially deteriorate over time due to environmental factors, which could lead to over-aggressive combustion in the event of an air bag deployment. This could create excessive internal pressure within the inflator, and the body of the inflator could rupture.

155.    It was not until its April 2013 Report that Takata finally admitted that the defective inflators were installed as original equipment in vehicles manufactured by companies other than Honda, including Toyota, Nissan, Mazda, and BMW. Takata did not know, however, how many inflators were installed as original equipment in vehicles manufactured by companies other than Honda.

156.    In April 2013, based on Takata's new admissions, six major automakers, including Nissan, Mazda, BMW, Pontiac, and Honda, issued recalls of 3.6 million vehicles containing Takata airbags.

157.    With the increased awareness and scrutiny, news of incidents became more widespread:

a.    On August 5, 2013, Joseph Nasworthy of Jacksonville, Florida suffered severe lacerations to his eye and nose when the Takata airbag exploded upon deployment in his 2005 Honda Civic.

b.    On September 1, 2013, Stephanie Erdman of Destin, Florida was driving a 2002 Honda Civic when she was hit in the eye by shards of metal that shot from the Takata airbag.  Ms. Erdman filed suit and reached a confidential settlement.

c.    Also in September 2013, when police got to the scene of a minor car accident in Alhambra, California, they thought the driver, Hai Ming Xu, had been shot in the face.  In fact, he was killed by shrapnel exploding from the Takata airbag in his 2002 Acura TL that deployed when it hit the wall of a building.  As *The New York Times* reported:

> The authorities have not determined a reason for the injuries, though his coroner's report cited tears in his airbag and facial trauma from a foreign object.  And problems persist with Honda's reporting of potential defects.
>
> In at least four more recent suspected ruptures, including the one linked to [the California driver's] death, Honda has not filed a so-called early warning report with safety regulators, as is required in cases where there is a claim of defect that resulted in an injury or death, according to case lawyers and legal filings.

d.    On October 12, 2013, Brandi Owens of Forsyth County, Georgia was injured in a low-speed accident when the driver's side Takata airbag of her 2013 Chevy Cruze exploded and detached from the steering wheel.  According to a lawsuit, metal from the airbag hit Owens in the face and left her blind in one eye.

158.    By 2014, the incident rate picked up even more dramatically, with over a dozen incidents involving injury or fatalities in Nissan, Honda, Toyota, Chevy, and Mazda vehicles taking place in a variety of regions in the country, from humid Puerto Rico to far drier Massachusetts and California.  For example:

a.      On February 19, 2014, a Takata passenger airbag ruptured and sprayed metal fragments at the passenger following a crash in a 2007 Chrysler 300.

b.      On February 20, 2014, a Takata driver's side airbag in a 2003 DodgeRam 1500 ruptured and ejected metal fragments following an accident.  The driver suffered severe physical injury as a result.

c.      On March 14, 2014, Susan Cosgrove of Fremont, California was injured in a low-speed accident while driving a 2013 Chevy Cruze. The Takata-related recall notice on her car arrived at her residence after the incident.

d.      On May 29, 2014, Corey Burdick of Eustes, Florida, was driving a 2001 Honda Civic when the airbag deployed and sent shards of metal into his eye.

e.      In June 2014, a low-speed accident involving a 2005 Honda Accord in Los Angeles, California, caused the car's driver airbag to "detonate," sending hot metal and plastic shrapnel into the cabin.

159.    With accidents proliferating, Takata met with NHTSA officials on May 20, 2014 to provide information about inflator ruptures not covered by previous recalls.  At that meeting, Takata noted that "all six of the potentially-relevant rupture incidents had occurred in either Florida or Puerto Rico."  The referenced incidents included both passenger and driver side airbags.  This statement omitted one of the earliest incidents, Ms. Weaver's 2003 accident in Arizona, as well as later incidents in drier locales, as noted above.

160.    On June 11, 2014, NHTSA's ODI published an ODI Resume for a preliminary evaluation of Investigation No. PE 14-016.  That document stated that NHTSA was opening an investigation "in order to collect all known facts from [Takata] and the vehicle manufacturers

that it believes may have manufactured vehicles equipped with inflators produced during the same period as those that have demonstrated rupture events in the field."

161.    Also on June 11, 2014, Takata informed NHTSA that it "believes that an [sic] number of the inflators identified above were provided to the following vehicle manufacturers for use in vehicles sold in the United States (the manufacturers are listed in alphabetical order): BMW, Chrysler, Ford, Honda, Mazda, Nissan, and Toyota."  Takata's June 11, 2014 letter further stated:

> If we determine that any of those inflators were sold to other vehicle manufacturers, we will let you know promptly. Takata is not certain which models or model years of vehicles are equipped with the subject inflators, and it does not know how many of those vehicles were sold in or are registered in the States to be covered by the requested field actions. That information will need to be obtained from the affected vehicle manufacturers.

162.    On June 20, 2014, Honda issued additional recalls for a total of nearly 4.5 million Honda and Acura vehicles that contained Defective Airbags.

163.    On June 26, 2014, GM recalled over 29,000 Chevrolet Cruze vehicles because the Defective Airbags have a tendency to not deploy at all or rupture and cause metal fragments to strike and severely injure vehicle occupants.

164.    By the end of June 2014, the number of vehicles that had been recalled due to Takata's Defective Airbags had increased to over 6 million.  The Defendants, including the Honda Defendants, however, had still not recalled all of the vehicles containing Defective Airbags.

165.    On July 8, 2014, Honda expanded a "two million vehicle air bag recall by as many as one million more vehicles in California."  *TheNew York Times* reported that "[a] defective inflator could explode in a crash, sending shards of its metal casing into the passenger

compartment. The inflator was made by Takata Corporation, which has said the propellant inside the inflator was not properly prepared and was too powerful."

166.    In August 2014, Honda issued yet another recall of Honda and Acura vehicles, its ninth for the defect – bringing the total of recalled Honda and Acura vehicles to six million.

167.    The tragic pattern of mounting injuries and casualties in the face of Defendants' sluggish response continued:

　　　　a.    On July 7, 2014, Claribel Nunez of Hialeah, Florida, suffered severe wounds to her forehead from shrapnel that exploded out of a Takata airbag in her 2001 Honda Civic.

　　　　b.    On August 17, 2014, a Takata airbag ruptured after an accident in a 2007 Ford Mustang, deploying with abrupt force and ejecting a metal fragment into the driver's leg. Ford was notified of the incident.

　　　　c.    On October 2, 2014, Florida resident Hien Tran died, four days after her 2001 Honda Accord struck another car in Orlando and the Takata airbag exploded, sending shrapnel into her neck.  The medical examiner stated that the shrapnel tore through the airbag, hitting Ms. Tran and causing "stab-type wounds" and cutting her trachea.  Indeed, her death was initially investigated as a homicide by detectives.  A week after she died, she received a letter in the mail from Honda urging her to get her car fixed because of faulty airbags that could explode.

　　　　F.    **2014-2015: Forced National Recall and Takata's Admission of a Defect**

168.    On October 22, 2014, NHTSA expanded the recall list to cover ten automakers and 7.8 million vehicles, over 5 million of which were Hondas.  In a Consumer Advisory dated October 22, 2014, NHTSA sent an urgent warning to the owners of the now "7.8 million Affected Vehicles":

The National Highway Traffic Safety Administration urges owners of certain

Toyota, Honda, Mazda, BMW, Nissan, Mitsubishi, Subaru, Chrysler, Ford and General Motors vehicles to act immediately on recall notices to replace defective Takata airbags. Over seven million vehicles are involved in these recalls, which have occurred as far back as 18 months ago and as recently as Monday. The message comes with urgency, especially for owners of vehicles affected by regional recalls in the following areas: Florida, Puerto Rico, limited areas near the Gulf of Mexico in Texas, Alabama, Mississippi, Georgia, and Louisiana, as well as Guam, Saipan, American Samoa, Virgin Islands and Hawaii.

169.    On October 29, 2014, NHTSA sent letters to ten automakers regarding the safety risks posed by the Takata airbags.  The letter stated that "[t]he ongoing cooperation of all manufacturers who have recalled vehicles is essential to address this safety risk," and that the "NHTSA team is engaged with you in critical work to better understand the failures and take action to remedy the safety risk…."  NHTSA's letter also asked the automakers to provide NHTSA with information as to their recall process, urged a faster response from them, and stated that "more can and should be done as soon as possible to prevent any further tragedies."

170.    The U.S. Department of Justice is also investigating whether Takata committed any crimes.  On November 13, 2014, the United States District Court for the Southern District of New York issued a federal grand jury subpoena to Takata and Honda.

171.    By November 18, 2014, it was clear to NHTSA that even the extensive recalls to date were insufficient.  NHTSA therefore demanded a national recall of Chrysler, Ford, Honda, Mazda, and BMW vehicles with certain driver airbags made by Takata.

172.    Takata refused to support a national recall at a hearing before the U.S. House of Representatives Energy and Commerce Subcommittee on December 3, 2014, claiming there was "not enough scientific evidence" to support a national recall.  Yet, as NHTSA Administrator David Friedman stated, "when we saw real-world incidents on the driver side, one in California, we pushed Honda to make sure that their recall covered that region. Then very recently, we became aware of a driver side incident in North Carolina. With six total incidents, two of which

are outside that region, we can no longer support a regional recall. Our policy is clear: Recalls must be nationwide unless the manufacturers can demonstrate that they are regional. With the new data, it is clear they can no longer demonstrate that the region that was used before was appropriate for driver side airbags."

173.     The geographic scope of the incidents undermined Takata's focus on humidity as the defining contributor to the dangerous ruptures.  As Mr. Friedman explained, "[o]ne of the most frustrating parts about this is that neither the automakers nor Takata have been able to get to the bottom of the root cause on this. We have been pushing them to do so."

174.     As of the December 3, 2014 House hearing, Honda, Ford, Chrysler, and Toyota had all agreed to a nationwide recall, principally for driver side airbags.  Days later, Mazda expanded the geographic scope of its recall.  By December 23, BMW had also agreed to a nationwide recall.

175.     Having misrepresented and omitted the nature and scope of the Inflator Defect for over a decade, the 10 vehicle manufacturers met in December 2014 to "sort out a way to understand the technical issues involved."  A few months later, in March 2015, Honda announced an advertising campaign to promote the recall—a step it could and should have taken a decade ago.  A few days later, Honda announced another 105,000 vehicles that needed to be recalled (Recall 15V-153), consisting of vehicles that should have been part of the 2014 recalls.

176.     Frustrated by Takata's continual foot-dragging, NHTSA imposed a $14,000 per day fine that started on Friday, February 20, 2015, concluding that Takata had not been forthcoming with the information.  Days later, NHTSA demanded that Takata preserve all airbag inflators removed through the recall process.

177.    In response to pressure from NHTSA and private plaintiffs and public scrutiny, Defendants were forced to consult with external explosives and airbag specialists, and performed additional testing on Takata's airbags.  This testing confirmed what Defendants already knew: Takata's airbags containing ammonium nitrate were defective and prone to over-aggressive deployment and rupture.

178.    In light of this testing, Takata was unable to deny the existence of the Inflator Defect any longer.  On May 18, 2015, Takata filed four Defect Information Reports ("DIRs") with NHTSA and agreed to a Consent Order regarding its (1) PSDI, PSDI-4, and PSDI-4K driver air bag inflators; (2) SPI passenger air bag inflators; (3) PSPI-L passenger air bag inflators; and (4) PSPI passenger air bag inflators, respectively.  After concealing the Inflator Defect for more than a decade, Takata finally admitted that "a defect related to motor vehicle safety may arise in some of the subject inflators."  And in testimony presented to Congress following the submission of its DIRs, Takata's representative admitted that the use of ammonium nitrate is a factor that contributes to the tendency of Takata's airbags to rupture, and that as a result, Takata will phase out the use of ammonium nitrate.

179.    Still, even Takata's recent defect admission is inaccurate and misleading, because the Inflator Defect is manifest in each of Takata's inflators containing ammonium nitrate.  And shockingly, Takata still intends to produce new inflators with ammonium nitrate, even after admitting that such inflators are prone to rupture, and thus create an unacceptable public safety hazard.

180.    Further, in its DIRs, Takata acknowledged that the Inflator Defect is present in inflators that were installed in vehicles as replacement parts through prior recalls, necessitating a second recall of those vehicles.

181.    As a result of Takata's admission that its inflators are defective, NHTSA now estimates that there are 23.4 million defective inflators in over 19 million vehicles.  While Takata has records tracking which manufacturers it sold Defective Airbags to, it claims not to have records indicating which vehicles those Defective Airbags were installed in.  The Vehicle Manufacturers possess those records, however, and are thus in the process of identifying which vehicles must be recalled based on Takata's DIRs, and its corresponding admission that its inflators are defective.

182.    Still, Takata refuses to immediately conduct nationwide recalls of all airbags containing the Inflator Defect.  While Takata has agreed to participate in a nationwide recall of airbags containing the PSDI, PSDI-4, and PSDI-4K driver-side air bag inflators and SPI passenger-side airbag inflators, it is still insisting on regional, phased recalls of vehicles equipped with its PSPI-L passenger air bag inflators and PSPI passenger air bag inflators.

183.    In the meantime, the risk of injury remains very real, and is exacerbated by Defendants' poor execution of the recalls, as discussed herein.

a.    On June 25, 2014, Patricia Mincey was rendered quadriplegic due to a Takata airbag rupture while driving her 2001 HondaCivic in Jacksonville, Florida.

b.    On July 22, 2014, Joshua Reliford suffered severe facial and brain injuries due to a Takata airbag rupture while driving his 2001 Honda Civic in McCraken County, Kentucky.

c.    On July 28, 2014, Francisco Demarco died due to a Takata airbag rupture while riding in the passenger seat of a 2007 Honda Accord in Palm Beach County, Florida.

d.       On October 4, 2014, Devon Rideout suffered permanent loss of vision due to an alleged Takata airbag rupture while riding passenger in a 2001 BMW 330i in Chesapeake City, Virginia.

e.       On November 19, 2014, Racquel Hudson suffered extensive first and second degree burns due to a Takata airbag rupture while driving her 2004 Honda Odyssey in San Antonio, Texas.

f.       On December 12, 2014, the driver airbag in a 2002 BMW 325 parked in the owner's driveway deployed with such energy that it melted and burned the dashboard and ceiling panel, created burn marks throughout the cabin, and shattered the front windshield.

g.       On December 31, 2014, the Takata driver airbag in a 2008 Mazda 6 deployed following an accident, ejecting metal fragments that injured the driver's face.

h.       On January 18, 2015, Carlos Solis was killed in an accident in Houston, Texas, and a ruptured Takata airbag was the suspected cause.

i.       On April 5, 2015, the Takata driver-side airbag in a 2005 Honda Accord ruptured, sending metal shards and shrapnel into the vehicle and severing 22-year old Kylan Langlinais's carotid artery; Honda's recall notice arrived two days after the crash, and Ms. Langlinais died from her injuries two days later.

184.     Over the past 13 years that Takata has known there was a problem with the safety of its airbags, there have been at least seven deaths and 139 injuries linked to defective Takata airbags.  As detailed above, the incidents date back to at least 2003, and involve vehicles made by Acura, BMW, Chevrolet, Honda, Mazda, Subaru, and Toyota.  Each of the Defendants knew of the Inflator Defect by virtue of these incidents, but failed to disclose the nature and scope of the Inflator Defect.

185.    The Defendants were on further notice due to unusual Takata airbag deployments that should have prompted further inquiry into the airbags' fitness for use.  A review of publicly-available NHTSA complaints shows dozens of incidents of Takata airbags inadvertently deploying in the Class Vehicles, an event that may be tied to the unstable and volatile ammonium nitrate propellant.  These complaints started as early as September 2005, and involve vehicles manufactured by Acura, BMW, Dodge, Ford, Mitsubishi, Pontiac, Subaru, and Toyota.  Some of these incidents showed still further signs of the Inflator Defect, including airbags that deployed with such force that they caused the windshield to crack, break, or shatter, and others that caused unusual smoke and fire (or both).  For example:

a.    Takata airbags inadvertently deployed and caused windshields to crack, shatter, or break in a 2004 Mitsubishi Lancer on November 23, 2006, a 2003 Toyota Corolla on May 3, 2010, a 2003 Toyota Matrix on August 17, 2010 (in addition to causing unusual smoke), and a 2003 Toyota Matrix on January 29, 2012 (in addition to damaging the dashboard).

b.    Takata airbags inadvertently deployed and caused unusual smoke and heat in a 2003 Acura MDX on January 29, 2012, causing the driver skin burns, and a 2003 Toyota Corolla on March 17, 2014.

III.    **The Defendants Sold Their Vehicles As "Safe" and "Reliable"**

186.    At all relevant times, in advertisements and promotional materials, the Defendants continuously maintained that their vehicles were safe and reliable.

187.    Examples of the Vehicle Manufacturers' safety and reliability representations, from 2000 through the present, include the following:

a.    **BMW**:

- In 2005, BMW represented on its website: "Driver's and passenger's front airbag supplemental restraint system (SRS) with "smart" dual-threshold, dual-stage deployment and sensor to help prevent unnecessary passenger's airbag deployment."

- In 2008 BMW represented on its website: "The driver and front passenger airbags provide effective protection for the head and upper-torso area, preventing contact with the steering wheel and dashboard. In a head-on collision, you have the best possible protection."

- In 2008 BMW represented on its website: "The principle behind the function of the front airbags for driver and passenger is very simple: in the event of an impact with a force greater than the safe threshold, the airbag sensors activate a substance that causes the airbags to instantly inflate. Within a fraction of a second, the airbags form a protective cushion over the steering wheel and dashboard, significantly reducing the risk of cranial and upper body injuries."

- In 2015, BMW represented on its website: "There is no end to our quest for the next innovation. And it's not just about greater power and more efficient performance. It's also about safety. We prepare our vehicles to expect the unexpected."

b.    **FORD:**

64

- In 2006, Ford represented in brochures that its cars possessed "up-to-the-minute safety and security systems help protect you and your passengers out there on the road."

- In 2006, Ford also represented in brochures that its cars contained a : "PersonalSafetySystem®,"which "enhances protection for the driver and front passenger in certain frontal collisions. The system customizes the deployment of the dual-stage front airbags based on several criteria, including the driver's seat position, whether the front safety belts are in use, the amount of pressure exerted on the front-passenger's seat, and the overall severity of the impact."

- In 2015, Ford represented on its website: "At Ford, we hold ourselves to very high standards for vehicle safety. The fact is, vehicle safety is a critical part of our brand promise to Go Further. We aim to give customers peace of mind and make the world safer by developing advanced safety technologies and making them available across a wide range of vehicles."

c.    **HONDA:**

- In 2002, Honda represented on its website: "Having already earned top safety ratings with its quadruple five-star front- and side-impact crash test ratings, the 2002 Odyssey now offers the latest generation of airbag systems from Honda. Driver's and front passenger's dual stage airbags (SRS) along with driver's and front passenger's side airbags are now standard equipment on all models

65

- yet another minivan first… Both front airbags have a dual-stage inflator that can deploy the airbag at one of two rates depending on the severity of the crash… The front passenger's side airbag has an automatic cutoff system that is designed to prevent side airbag deployment if a child (or small statured adult) leans into the side airbag deployment path. Once the child returns to an upright position, the side airbag will be able to deploy and provide protection in the event of a side impact… Building on the standard anti-lock braking system (ABS), new standard rear disc brakes result in improved stopping performance with higher resistance to brake fade and a more responsive brake pedal feel. Amber rear turn signals have been added, which help other drivers differentiate the indicators with increased clarity."

- In 2002, Honda represented in a commercial: "5-stars of frontal collision tests… that's a safe car. Safe, get it through your head. To see what safe really means, take a look at a close look at the 2002 civic from Honda."

- In 2002, Honda represented in brochures:"Honda's commitment to safe driving is in evidence throughout every vehicle… Every new vehicle comes with dual front airbags (SRS), most using a dual stage design... All designed to keep you and yours out of harm's way."

- In 2004, Honda represented in brochures:"A glance at the crash-test data posted by the U.S. government's National Highway Traffic Safety Administration reveals a galaxy of 5-star ratings for Honda cars and trucks. In fact, five of our models to date – Accord Coupe, Civic Coupe, CR-V, Odyssey and Pilot – have earned the highest NHTSA crash-test ratings in frontal and side impact testing… It's a solid testament to our emphasis on safety."

- In 2007, Honda represented on its website: "Through innovative original research, Honda has created advanced airbags that offer outstanding levels of occupant protection."

- In 2007, Honda also represented on its website: "Honda led the industry through advances such as driver and front passenger airbags with "dual output inflators" that adjust the deployment force of the airbags to the severity of the crash."

- In 2007, Honda also represented on its website: "The Honda Accord is the first mid-size sedan to offer front, front-side and side curtain airbags as standard equipment. Accord earned a 5-star frontal impact rating from the U.S. government and a frontal "Best Pick" from the Insurance Institute for Highway Safety (IIHS)."

- In 2007, Honda also represented on its website: "Every Honda and Acura vehicle begins with a basic structure designed to be fundamentally safe, but we add advanced technology as standard equipment that can help the driver maintain control of the vehicle."

- In 2015, Honda represented on its website: "Honda is committed to providing safety for everyone—that means crash protection not only for our own drivers and passengers, but also for the occupants of other vehicles, and injury mitigation for pedestrians." "As a leader, Honda looks beyond government regulations, studying real world situations to develop new safety technologies for everyone."

- In 2015, Honda represented on its website: "Acura believes driving a luxury car should be a highly enjoyable experience. And while we tend to dwell on the more exhilarating aspects of our vehicles, we consider your safety a top priority. . . .  Safety has been top of mind with Acura engineers since day one. . . .  Over the years, we've added many advanced safety technologies to the list, and the vast majority of them are now standard on every model."

d.  **MAZDA**:

- In 2004, Mazda represented in brochures that its cars possessed "inspiring performance" and "reassuring safety features."

- In 2005, Mazda represented on its website: "in every configuration, you'll enjoy Mazda's legendary performance, function, style and safety."

- In 2015, Mazda represented on its website: "In the realm of safety, Mazda's aim is to achieve a safe and accident-free automotive society from the three viewpoints of vehicles, people, and roads and infrastructure. Specifically, the Company carries out research

68

and development into safety technologies based on the Mazda ProactiveSafety philosophy, which particularly respects the driver, and has released vehicles featuring the full suite of Mazda's advanced safety technologies…."

e.     **MITSUBISHI**:

- In 2007, Mitsubishi represented on its website that its vehicles were equipped with"Advanced front airbags."

- In 2015, Mitsubishi represented on its website: "We are committed to providing the utmost driving pleasure and safety for our valued customers and our community. On these commitments we will never compromise. This is the Mitsubishi Motors way."

f.     **NISSAN/INFINITI**:

- In 2005, Nissan represented in brochures that its vehicles possessed "an entire set of safety features to help protect you from the unavoidable. Including steel reinforcements, guard beams and advanced airbags that will help safeguard you and your passengers in the event of an accident."

- In 2015, Nissan represented on its website: "Nissan is committed to its position as a leader in the world of automotive safety. This dedication to comprehensive safety goes into the engineering and design of every vehicle we make…."

g.     **SUBARU**:

- In 2005, Subaru represented on its website: "Features like seatbelts with front pretensioners and force limiters, crumple zones, side-impact beams, front air bags and a Ring-Shaped Reinforcement Frame aid in minimizing the effects of a collision."

- In 2005, Subaru represented in its brochures:"THE SUBARU DRIVING EXPERIENCE EVOKES MANY EMOTIONS. Confidence should always be one of them. Which is why every Subaru is engineered according to the principles of "Active Driving/Active Safety."

- In 2005, Subaru representedin itsbrochures: "Advanced front air bags, including passenger-side dual-stage deployment, help provide optimal protection for the driver and front passenger."

- In 2015, Subaru represented on its website: "Safety drives Subaru design."

h. **TOYOTA/LEXUS**:

- In 2002, Toyota represented on its website: "With safety features like dual front air bags, crumple zones and 3-point seatbelts in every seating position. So gather up all the hikers -- big and small -- and head out. Way out."

- In 2015, Toyota represented on its website: "For us, the journey towards a safe road never ends. This belief, along with our collaborative research efforts, drives us to create advancements and innovations in safety that have helped (and continue to help) prevent crashes and protect people."

70

IV.    **Automotive Recyclers Purchased Vehicles Containing Defective Airbags for Amounts Greater than Their Actual Value and Maintained the Defective Airbags for the Purposes of Resale**

188.    Generally, automotive recycling businesses purchase vehicles from a number of sources, including insurance salvage auctions, tow operators, charities and the public.

189.    Automotive recycling businesses calculate the purchase price for individual vehicles based, in part, on the presence and condition of the automotive parts contained in the vehicle.

190.    Automotive recycling businesses store and maintain the airbags and then resell them to consumers, automotive repair shops, automotive dealerships, wholesalers or other automotive recyclers.

191.    Here, Plaintiff and Class members purchased Class Vehicles, which contained Takata airbags, at insurance salvage auctions and from tow operators, charities and the public.

192.    Plaintiff owns hundreds of airbags that are currently subject to Takata-related recalls.

193.    On information and belief, Plaintiff has purchased at least the Class Vehicles identified in Exhibit A and currently owns at least the airbags from those Class Vehicles.

194.    Automotive recyclers calculated the purchase prices for each of the Class Vehicles based on the demand for the vehicles and their constituent parts.

195.    After automotive recyclers purchased the Class Vehicles containing the Takata airbags, automotive recyclers transported the vehicles to their facilities. An inspection of the airbags by automotive recyclers would not have revealed the Inflator Defect.

196.    At the time that automotive recyclers purchased the Class Vehicles, automotive recyclers had a reasonable expectation that Defendants would abide by federal, state, and common law obligations to affirmatively disclose known defects in a timely manner.

197.    This did not happen and, as a result, automotive recyclers purchased the Class Vehicles containing Takata airbags for amounts greater than their worth.

198.    As detailed above, national and regional media outlets around the country have reported extensively about the defective airbags in recent months, raising public awareness of their defect and its safety implications. The value of the Takata airbags in the Class Vehicles has been negatively impacted and the resale value of these airbags is effectively zero.  Moreover, the resale value of the other parts in the Class Vehicles has been similarly impacted.  Finally, Plaintiff and members of the Classes have been injured by the costs of storing, maintaining, and otherwise disposing of the defective Takata airbags.

## TOLLING OF THE STATUTE OF LIMITATIONS

### Fraudulent Concealment

199.    Upon information and belief, Defendant Honda has known of the Inflator Defect in the Takata airbags in Honda's vehicles since 2004.  The Defendants have known or should have known of the Inflator Defect in Takata's airbags no later than 2008.  Defendants have concealed from or failed to notify Plaintiff, Class members, and the public of the full and complete nature of the Inflator Defect.

200.    Although Defendants have now acknowledged to safety regulators that Takata's airbags are defective, for years, Defendants did not fully investigate or disclose the seriousness of the issue and in fact downplayed the widespread prevalence of the problem.

201.    Any applicable statute of limitations has therefore been tolled by Defendants'
knowledge, active concealment, and denial of the facts alleged herein, which behavior is
ongoing.

### Estoppel

202.    Defendants were and are under a continuous duty to disclose to Plaintiff and Class
members the true character, quality, and nature of the Class Vehicles.  They actively concealed
the true character, quality, and nature of the vehicles and knowingly made misrepresentations
about the quality, reliability, characteristics, and performance of the vehicles.  Plaintiff and Class
members reasonably relied upon Defendants' knowing and affirmative misrepresentations and/or
active concealment of these facts.  Based on the foregoing, Defendants are estopped from relying
on any statute of limitations in defense of this action.

### Discovery Rule

203.    The causes of action alleged herein did not accrue until Plaintiff and Class
members discovered that their vehicles had the Defective Airbags.

204.    Plaintiff and Class members, however, had no realistic ability to discern that the
vehicles were defective until – at the earliest – after their vehicles were recalled.  And even then,
Plaintiff and Class members had no reason to discover their causes of action because of
Defendants' active concealment of the true nature of the defect.

### *American Pipe* Tolling

205.    A putative class action suit on behalf of automotive recyclers was brought against
Defendants on February 10, 2015. *Automotive Dismantlers and Recyclers Assoc., Inc. v. Takata
Corp. et al.,* 1:15-cv-20520-FAM (Moreno, J.).  At the time it was brought, Plaintiff and the

73

other Class members in this case were part of the classes alleged in the *Automotive Dismantlers* action.

206.    Accordingly, pursuant to *American Pipe and Construction Co. v. Utah*, 414 U.S. 538 (1974), the claims of Plaintiff and other Class members were tolled from at least February 10, 2015.

<u>**CLASS ACTION ALLEGATIONS**</u>

207.    The Classes' claims all derive directly from a single course of conduct by Takata and the Defendants.  This case is about the responsibility of Defendants, at law and in equity, for their knowledge, their conduct, and their products.  Defendants have engaged in uniform and standardized conduct toward the Classes.  They did not differentiate, in degree of care or candor, their actions or inactions, or in the content of their statements or omissions, among individual Class members.  The objective facts on these subjects are the same for all Class members. Within each Claim for Relief asserted by the respective Classes, the same legal standards govern. Additionally, many states, and for some claims all states, share the same legal standards and elements of proof, facilitating the certification of multistate classes for some or all claims. Accordingly, Plaintiff brings this lawsuit as a class action on its own behalf and on behalf of all other persons similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) and/or (b)(2) and/or (c)(4). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

**Numerosity and Ascertainability**

208.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1).  There are millions of Class Vehicles nationwide, and thousands of Class Vehicles in each of the States. Moreover, there are thousands of Nationwide Automotive Recycler Class members in the United States and hundreds in each State.  Accordingly, individual joinder of all Class members is impracticable.

209.    Each of the Classes is ascertainable because its members can be readily identified using licensing records, registration records, sales records, production records, and other information kept by Takata and the Defendants or third parties in the usual course of business and within their control.  Plaintiff anticipates providing appropriate notice to each certified Class, in compliance with Fed. R. Civ. P. 23(c)(1)(2)(A) and/or (B), to be approved by the Court after class certification, or pursuant to court order under Fed. R. Civ. P. 23(d).

**Predominance of Common Issues**

210.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) because questions of law and fact that have common answers that are the same for each of the respective Classes predominate over questions affecting only individual Class members. These include, without limitation, the following:

       a.    Whether the Class Vehicles suffer from the Inflator Defect;

       b.    Whether the Class Vehicles and their constituent parts have suffered a diminution of value as a result of those Vehicles' incorporation of the airbags at issue;

       c.    Whether the defective Takata airbags in the Class Vehicles have suffered a diminution of value;

       d.      Whether Defendants knew or should have known about the Inflator Defect, and, if so, how long Defendants have known of the defect;

       e.      Whether the defective nature of the Class Vehicles constitutes a material fact reasonable businesses would have considered in deciding whether to purchase a Defective Vehicle;

       f.      Whether Defendants had a duty to disclose the defective nature of the Class Vehicles to Plaintiff and Class members;

       g.      Whether Defendants omitted and failed to disclose material facts about the Class Vehicles;

       h.      Whether Defendants' concealment of the true defective nature of the Class Vehicles induced Plaintiff and Class members to act to their detriment by purchasing the Class Vehicles and the defective Takata airbags contained therein;

       i.      Whether Defendants' conduct tolls any or all applicable limitations periods by acts of fraudulent concealment, application of the discovery rule, or equitable estoppels;

       j.      Whether Defendants misrepresented that the Class Vehicles were safe;

       k.      Whether Defendants engaged in unfair, deceptive, unlawful and/or fraudulent acts or practices in trade or commerce by failing to disclose that the Class Vehicles were designed, manufactured, and sold with defective airbag inflators;

       l.      Whether Defendants' conduct, as alleged herein, was likely to mislead a reasonable business;

m.      Whether Defendants' statements, concealments and omissions regarding the Class Vehicles were material, in that a reasonable business could consider them important in purchasing, selling, maintaining, or operating such vehicles;

n.      Whether Defendants violated each of the States' deceptive trade practices statutes, and if so, what remedies are available under those statutes;

o.      Whether Plaintiff and the Classes are entitled to a declaratory judgment stating that the airbag inflators in the Class Vehicles are defective;

p.      Whether Defendants' unlawful, unfair, and/or deceptive practices harmed Plaintiff and the Classes;

q.      Whether Defendants have been unjustly enriched by their conduct;

r.      Whether Plaintiff and the Classes are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction;

s.      Whether Defendants should be declared responsible for notifying all Class members of the Inflator Defect and ensuring that all vehicles with the airbag inflator defect are promptly recalled and repaired;

t.      What aggregate amounts of statutory penalties are sufficient to punish and deter Defendants and to vindicate statutory and public policy;

u.      How such penalties should be most equitably distributed among Class members;

## **Typicality**

211.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because Plaintiff's claims are typical of the claims of the Class members, and arise from the same course

of conduct by Takata and the Defendants.  The relief Plaintiff seeks is typical of the relief sought

for the absent Class members.

**Adequate Representation**

212.    Plaintiff will fairly and adequately represent and protect the interests of the

Classes. Plaintiff has retained counsel with substantial experience in prosecuting class actions,

including actions involving defective products.

213.    Plaintiff and their counsel are committed to vigorously prosecuting this action on

behalf of the Classes, and have the financial resources to do so. Neither Plaintiff nor its counsel

have interests adverse to those of the Classes.

**Superiority**

214.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(2) because the

Defendants have acted and refused to act on grounds generally applicable to each Class, thereby

making appropriate final injunctive and/or corresponding declaratory relief with respect to each

Class as a whole.

215.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3) because a class

action is superior to other available methods for the fair and efficient adjudication of this

controversy.  The common questions of law and of fact regarding Takata and the Defendants'

conduct and responsibility predominate over any questions affecting only individual Class

members.

216.    Because the damages suffered by each individual Class member may be relatively

small, the expense and burden of individual litigation would make it very difficult or impossible

for individual Class members to redress the wrongs done to each of them individually, such that

most or all Class members would have no rational economic interest in individually controlling

the prosecution of specific actions, and the burden imposed on the judicial system by individual

litigation by even a small fraction of the Class would be enormous, making class adjudication the

superior alternative under Fed. R. Civ. P. 23(b)(3)(A).

217.    The conduct of this action as a class action presents far fewer management

difficulties, far better conserves judicial resources and the parties' resources, and far more

effectively protects the rights of each Class member than would piecemeal litigation.  Compared

to the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies of

individualized litigation, the challenges of managing this action as a class action are substantially

outweighed by the benefits to the legitimate interests of the parties, the court, and the public of

class treatment in this court, making class adjudication superior to other alternatives, under Fed.

R. Civ. P. 23(b)(3)(D).

218.    Plaintiff is not aware of any obstacles likely to be encountered in the management

of this action that would preclude its maintenance as a class action. Rule 23 provides the Court

with authority and flexibility to maximize the efficiencies and benefits of the class mechanism

and reduce management challenges. The Court may, on motion of Plaintiff or on its own

determination, certify nationwide, statewide and/or multistate classes for claims sharing common

legal questions; utilize the provisions of Rule 23(c)(4) to certify any particular claims, issues, or

common questions of fact or law for class-wide adjudication; certify and adjudicate bellwether

class claims; and utilize Rule 23(c)(5) to divide any Class into subclasses.

219.    The Classes expressly disclaim any recovery in this action for physical injury

resulting from the Inflator Defect without waiving or dismissing such claims.  Plaintiff is

informed and believes that injuries suffered in crashes as a result of the defective airbags

implicate the Class Vehicles, constitute evidence supporting various claims, including

diminution of value, and are continuing to occur because of Defendants' delays and inaction regarding the commencement and completion of recalls, and because of the installation of Defective Airbags as replacement airbags. The increased risk of injury from the Inflator Defect serves as an independent justification for the relief sought by Plaintiff and the Classes.

## REALLEGATION AND INCORPORATION BY REFERENCE

220.    Plaintiff realleges and incorporates by reference all of the preceding paragraphs and allegations of this Complaint, including the Nature of Claims, Factual Allegations, Tolling Allegations, and Class Action Allegations, as though fully set forth in each of the following Claims for Relief asserted on behalf of the Nationwide Class and the Statewide Classes.

## CLAIMS FOR RELIEF

## COUNT I

### VIOLATION OF 18 U.S.C. § 1962(c), THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO"), AGAINST THE HONDA DEFENDANTS

221.    Plaintiff brings this claim individually and on behalf of the Nationwide Automotive Recycler Class against the Honda Defendants.

222.    The Honda Defendants are all "persons" under 18 U.S.C. § 1961(3).

223.    The Honda Defendants violated 18 U.S.C. § 1962(c) by participating in or conducting the affairs of the Honda-Takata RICO Enterprise, as defined below, through a pattern of racketeering activity.

224.    Plaintiff and Class members are "person[s] injured in his or her business or property" by reason of the Honda Defendants' violation of RICO within the meaning of 18 U.S.C. § 1964(c).

## The Honda-Takata RICO Enterprise

225. The following persons, and others presently unknown, have been members of and constitute an "association-in-fact enterprise" within the meaning of RICO, and will be referred to herein collectively as the Honda-Takata RICO Enterprise:

a. The Honda Defendants, who designed, manufactured, and sold millions of vehicles equipped with Defective Airbags that they knew, or were reckless in not knowing, contained the Inflator Defect, the scope and nature of which they concealed from and misrepresented to the public and regulators for more than a decade, while falsely and inaccurately representing that their vehicles were safe, thereby deceiving Plaintiff and Class members.

b. Takata, who, with Honda's guidance, designed, manufactured, and sold millions of Defective Airbags knowing that they contained the Inflator Defect, the scope and nature of which they concealed from and misrepresented to the public and regulators for more than a decade.

c. The Honda Defendants' Officers, Executives, and Engineers, who have collaborated and colluded with each other and with other associates in fact in the Honda-Takata RICO Enterprise to deceive Plaintiff and Class members into purchasing dangerous and defective vehicles, and actively concealing the danger and Inflator Defect from Plaintiff and Class members.

d. Takata's Officers, Executives, and Engineers, who have collaborated and colluded with each other and with other associates in fact in the Honda-Takata RICO Enterprise to deceive Plaintiff and Class members into purchasing dangerous and defective vehicles, and actively concealing the danger and Inflator Defect from Plaintiff and Class members.

e. Dealerships that sell vehicles manufactured by the Honda Defendants, which sold or leased the Class Vehicles containing Defective Airbags to Plaintiff and Class members, and continue to install replacement airbags manufactured by Takata into recalled Class Vehicles that suffer from the same Inflator Defect that plagues the removed airbags.

81

226.    The Honda-Takata RICO Enterprise, which engaged in, and whose activities affected interstate and foreign commerce, is an association-in-fact of individuals and corporate entities within the meaning of 18 U.S.C. § 1961(4) and consists of "persons" associated together for a common purpose.  The Honda-Takata RICO Enterprise had an ongoing organization with an ascertainable structure, and functioned as a continuing unit with separate roles and responsibilities.

227.    While the Honda Defendants participated in the conduct of the Honda-Takata RICO Enterprise, they had an existence separate and distinct from the Honda-Takata RICO Enterprise.  Further, the Honda-Takata RICO Enterprise was separate and distinct from the pattern of racketeering in which the Honda Defendants have engaged.

228.    At all relevant times, the Honda Defendants operated, controlled or managed the Honda-Takata RICO Enterprise, through a variety of actions.  The Honda Defendants' participation in the Honda-Takata RICO Enterprise was necessary for the successful operation of its scheme to defraud because the Honda Defendants manufactured, marketed, and sold Class Vehicles with the Defective Airbags, concealed the nature and scope of the Inflator Defect, and profited from such concealment.

229.    The members of the Honda-Takata RICO Enterprise all served a common purpose: to sell as many airbags, and vehicles containing such airbags, as possible, and thereby maximize the revenue and profitability of the Honda-Takata RICO Enterprise's members.  The members of the Honda-Takata RICO Enterprise shared the bounty generated by the enterprise, i.e., by sharing the benefit derived from increased sales revenue generated by the scheme to defraud.  Each member of the Honda-Takata RICO Enterprise benefited from the common purpose: the Honda Defendants sold or leased more Class Vehicles, and received more for those vehicles, than they would have otherwise had the scope and nature of the Inflator Defect not been concealed; Takata sold more Defective Airbags to the Honda Defendants than they would have otherwise had the scope and nature of the Inflator Defect not been concealed; and the dealerships sold and serviced more Class Vehicles, and sold or leased those vehicles at a much

higher price, as a result of the concealment of the scope and nature of the Inflator Defect from Plaintiff and Class members.

## **Pattern of Racketeering Activity**

230.    The Honda Defendants conducted and participated in the conduct of the affairs of the Honda-Takata RICO Enterprise through a pattern of racketeering activity that has lasted for more than a decade, beginning no later than 2004 and continuing to this day, and that consisted of numerous and repeated violations of the federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign mail or wire facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

231.    For the Honda Defendants, the purpose of the scheme to defraud was to conceal the scope and nature of the Inflator Defect found in millions of Defective Airbags in the United States in order to sell more vehicles, to sell them at a higher price or for a higher profit, and to avoid incurring the expenses associated with recalling vehicles plagued by the Inflator Defect. By concealing the scope and nature of the Inflator Defect in millions of vehicles containing Defective Airbags, the Honda Defendants also maintained and boosted consumer confidence in the Honda brand, and avoided remediation costs and negative publicity, all of which furthered the scheme to defraud and helped the Honda Defendants sell more vehicles than they would otherwise have sold, and to sell them at a much higher price or for a higher profit.

232.    As detailed in the General Factual Allegations, the Honda Defendants were well aware of the risks of using ammonium nitrate as the propellant in its inflators, but intentionally subjected Plaintiff and Class members to those risks or consciously disregarded those risks in order to maximize their profits.  Moreover, once the Inflator Defect began maiming and killing vehicle occupants, on information and belief, the Honda Defendants held secret meetings that revealed the dangers associated with the Inflator Defect, but then continued to conceal the nature and scope of the Inflator Defect.

233.    To further the scheme to defraud, the Honda Defendants repeatedly misrepresented and concealed the nature and scope of the Inflator Defect.  The Honda

Defendants repeatedly described the defect as a contained and corrected manufacturing defect that only manifested itself in certain areas of the country, when in fact the Honda Defendants knew, or consciously disregarded knowing, that the Inflator Defect is a fundamental, uniform defect—i.e., the reckless use of the unstable and dangerous ammonium nitrate as the propellant in the inflator—that plagues every Takata airbag equipped in a Honda vehicle and manifests itself across the country.

234.    To further the scheme to defraud, the Honda Defendants concealed the nature and scope of the Inflator Defect from federal regulators, enabling it to escape investigation and costs associated with recalls for more than a decade.

235.    To further the scheme to defraud, the Honda Defendants would promote and tout the safety, reliability, and quality of their vehicles with airbags while simultaneously concealing the nature and scope of the Inflator Defect.

236.    To carry out, or attempt to carry out the scheme to defraud, the Honda Defendants have conducted or participated in the conduct of the affairs of the Honda-Takata RICO Enterprise through the following pattern of racketeering activity that employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud):

a.    The Honda Defendants devised and furthered the scheme to defraud by use of the mail, telephone, and internet, and transmitted, or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, writing(s) and/or signal(s), including the Honda website, communications with NHTSA, statements to the press, and communications with other members of the Honda-Takata RICO Enterprise, as well as advertisements and other communications to the Honda Defendants' customers, including Plaintiff and Class members; and

b.    The Honda Defendants utilized the interstate and international mail and wires for the purpose of obtaining money or property by means of the omissions, false pretense, and misrepresentations described herein.

237.    The Honda Defendants' pattern of racketeering activity in violation of the mail and wire fraud statutes included but was not limited to the following:

a.    During the relevant time period, the Honda Defendants transmitted, or caused to be transmitted (which hereinafter also means that the Honda Defendants acted with knowledge that the use of the interstate mails and wires would follow in the ordinary course of business, or such use was reasonably foreseeable), by means of mail and wire communication travelling in interstate or foreign commerce, between its offices in Japan and/or the United States, communications concerning the instability and volatility of ammonium nitrate, recognizing that Takata's inflators installed in Honda vehicles exposed vehicle occupants to an unacceptable risk of serious injury or death.

b.    Following a May 2004 accident in Alabama in which a Defective Airbag ruptured and spewed metal debris at the driver, the Honda Defendants transmitted, or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from its offices in Japan and/or in California to offices of regulators in Washington, D.C., and Takataoffices of representations that the rupture was an "anomaly."

c.    In November 2008, the Honda Defendants caused to be transmitted, by means of mail or wire communication travelling in interstate or foreign commerce, from Honda's offices in California to federal regulators in Washington, D.C., regulatory filings stating that the approximately 4,000 vehicles subject to its 2008 recall included all "possible vehicles that could potentially experience the problem [of a rupturing airbag inflator]," thereby concealing the nature and scope of the Inflator Defect.

d.    In December 2008, the Honda Defendants caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from Honda's offices in California to vehicle owners across the country, letters stating that that "[m]etal fragments could pass through the airbag cushion material, possibly causing injury to vehicle occupants."  This letter did not sufficiently communicate the severity of the threat to life and limb, and concealed the scope and nature of the Inflator Defect.  Owners were merely

85

advised to make an appointment to have their vehicle repaired, with no sense of urgency. In contrast, on October 22, 2014, NHTSA urged affected vehicle owners to "act immediately on recall notices to replace defective Takata airbags."

       e.     On July 29, 2009, the Honda Defendants caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from Honda's offices in California to federal regulators in Washington, D.C. an amended report identifying an estimated 440,000 additional vehicles that should have been subject to the 08V-953 recall. In this report, Honda stated "[t]he VIN range reflects all possible vehicles that could potentially experience the problem." In light of the 100-fold recall expansion, and what Plaintiff believes Honda knew about Takata's internal difficulties dealing with the recall, this statement was false and concealed the nature and scope of the Inflator Defect. Honda's chronology lists three "unusual deployments"—a euphemistic way of describing Ashley Parham's death in May 2009, Jennifer Griffin's shrapnel injuries in June 2009, and one other incident. This regulatory filing was misleading and served to conceal and/or minimize the threats posed by the Defective Airbags.

       f.     On September 16, 2009, the Honda Defendants caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from Honda's offices in California to federal regulators in Washington, D.C. information concerning safety recalls 08V-593 and 09V-259. This letter was co-drafted by Honda and Takata. NHTSA wanted to know why the first recall did not include the vehicles covered by the second recall. Among other things, Honda and Takata explained that several "additional deployments" had occurred outside of the VIN ranges of the first recall, prompting the latter recall. But Honda and Takata fraudulently omitted that one of those deployments caused Ashley Parham's death. Also, Honda and Takata claimed that the manufacturing problem was limited to only one high-precision compression press. Because Honda and Takata by then were aware of the litany of problems plaguing its Monclova, Mexico plant, this "explanation" was grossly self-serving for both Honda and Takata. Furthermore, Takata and Honda omitted the existence of secret

meetings discussing the danger of using ammonium nitrate in airbag inflators.  Once again, the
Honda Defendants intentionally deprived NHTSA and the public of accurate and complete
information.  As a result of this letter, the ODI closed its investigation into these two recalls.
The Honda Defendants thereby concealed the nature and scope of the Inflator Defect.

       g.      On February 9, 2010, the Honda Defendants caused to be transmitted, by
means of mail and wire communication travelling in interstate or foreign commerce, from
Honda's offices in California to federal regulators in Washington, D.C., another recall
communication again falsely assuring NHTSA and the public that "[t]he VIN range reflects all
possible vehicles that could potentially experience the problem."  Honda's "chronology" was
false and misleading because it did not mention any injuries.  Honda's explanation of the
defect—that two processes were used to prepare the inflator propellant and that one of them was
not within specifications—was misleading in light of what the Honda Defendants knew, or at
least should have known in light of the extensive problems at Takata's Monclova, Mexico plant
and serious injuries suffered by vehicle occupants as a result of the Inflator Defect.

       h.      Under the early warning reporting system established by the TREAD Act,
Honda was required to submit comprehensive quarterly reports to NHTSA disclosing incidents
involving injury or death with Honda vehicles.  In late 2014, Honda admitted that it violated 49
C.F.R. Part 579, Subpart C, by failing to submit early warning reports that comply with NHTSA
regulations.  Honda ultimately admitted that it failed to report 1,729 serious incidents resulting in
injuries or deaths to NHTSA between 2003 and 2014.  Eight of these incidents involved Takata
airbags.  In January 2015, Honda agreed to pay a $70 million fine for this startling violation of
the law.  In connection with its failure to comply with the TREAD Act, Honda transmitted, by
means of mail and wire communication travelling in interstate or foreign commerce, from
Honda's offices in California to NHTSA in Washington, DC, misleading quarterly reports that

omitted at least eight incidents involving injuries from Defective Airbags. As examples, upon information and belief, Honda transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from Honda's offices in California to NHTSA in Washington, DC, a misleading Early Warning Report for the Second Quarter of 2009 that omitted the death of Ashley Parham; a misleading Early Warning Report for the Second Quarter of 2007 that omitted an incident involving a front-airbag-induced injury in a Honda Odyssey; a misleading Early Warning Report for the First Quarter of 2005 that omitted an incident involving a front-airbag-induced injury in a 2001 Honda Civic; a misleading Early Warning Report for the Second Quarter of 2006 that omitted an incident involving a front-airbag-induced injury in a 2006 Honda Civic; and a misleading Early Warning Report in the First Quarter of 2010 that omitted incidents involving front-airbag-induced injuries in a 2002 Honda Accord and a 2001 Honda Accord;

238.    The Honda Defendants' conduct in furtherance of this scheme was intentional. Plaintiff and Class members were directly harmed as a result of the Honda Defendants' intentional conduct. Plaintiff, Class members, and federal regulators, among others, relied on the Honda Defendants' material misrepresentations and omissions.

239.    As described throughout this Complaint, the Honda Defendants engaged in a pattern of related and continuous predicate acts for more than a decade. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of defrauding Plaintiff and other Class members and obtaining significant monies and revenues from them while providing Defective Airbags worth significantly less than the purchase price paid. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

240.    The predicate acts all had the purpose of generating significant revenue and profits for the Honda Defendants and the Honda-Takata RICO enterprise at the expense of Plaintiff and Class members.  The predicate acts were committed or caused to be committed by the Honda Defendants through their participation in the Honda-Takata RICO Enterprise and in furtherance of its fraudulent scheme, and were interrelated in that they involved obtaining overpayments for a defective product and avoiding the expenses associated with remediating the Inflator Defect.

241.    By reason of and as a result of the conduct of the Honda Defendants, and in particular, its pattern of racketeering activity, Plaintiff and Class members have been injured in their business and/or property in multiple ways, including but not limited to:

a.    overpayment for purchased Class Vehicles and the airbags contained therein, in that the airbags are essentially valueless and Plaintiff and Class members are now unable to sell them; and

b.    the value of the Class Vehicles has diminished, thus reducing the value for which Plaintiff and Class members can resale the parts of Class Vehicles.

242.    The Honda Defendants' violations of 18 U.S.C. § 1962(c) have directly and proximately caused injuries and damages to Plaintiff and Class members, and Plaintiff and Class members are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief and costs and reasonable attorneys' fees pursuant to 18 U.S.C. §§ 1964(a) and 1964(c).

## COUNT II

**VIOLATION OF THE LANHAM (TRADEMARK) ACT, 15 U.S.C. §§ 1501 *et seq.***

243.    This claim is brought individually and on behalf of the Nationwide Automotive Recycler Class against all Defendants.

244.    The Lanham Act, 15 U.S.C. § 1125(a), entitled "False designation of origin, false descriptions, and dilution forbidden," provides in pertinent part:

> Civil action
>
> (1)    Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
>> (A)    is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>>
>> (B)    in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

245.    Defendants used and/or continue to use in commerce false or misleading descriptions of fact, and/or false or misleading representations and/or omissions of fact, which misrepresented, and were likely to cause and/or did cause confusion and mistake or to deceive, regarding Takata's defective airbags, the safety of the defective airbags and the Class Vehicles, the scope and cause of the Inflator Defect, and the extent of unreasonable danger of death or personal injury related to the Inflator Defect.

246.    As detailed more fully above, the Defendants' representations, omissions, statements, and false commentary have included misleading representations about the safety of the Class Vehicles and the scope of the Inflator Defect to:

> a.    The public and Class Vehicle purchasers, both in the form of advertising and responding to initial recall concerns;

     b.     The U.S. Congress;

     c.     The media; and

     d.     Federal regulators.

247.    The Defendants' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe" and "reliable", despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.  At all relevant times, in advertisements and promotional materials, the Defendants continuously maintained that their vehicles were safe and reliable.

248.    Examples of the Defendants' safety and reliability misrepresentations, from 2000 through the present, include but are not limited to the following:

a. **BMW**:
- In 2005 BMW represented on its website: "Driver's and passenger's front airbag supplemental restraint system (SRS) with 'smart' dual-threshold, dual-stage deployment and sensor to help prevent unnecessary passenger's airbag deployment."
- In 2008 BMW represented on its website: "The driver and front passenger airbags provide effective protection for the head and upper-torso area, preventing contact with the steering wheel and dashboard. In a head-on collision, you have the best possible protection."
- In 2008 BMW represented on its website: "The principle behind the function of the front airbags for driver and passenger is very simple: in the event of an impact with a force greater than the safe threshold, the airbag sensors activate a substance that causes the airbags to instantly inflate. Within a fraction of a second, the airbags form a protective cushion over the steering wheel and dashboard, significantly reducing the risk of cranial and upper body injuries."
- In 2015 BMW represented on its website: "There is no end to our quest for the next innovation. And it's not just about greater power and more efficient performance. It's also about safety. We prepare our vehicles to expect the unexpected."

b. **Ford:**

- In 2006 Ford represented in brochures that its cars possessed "up-to-the-minute safety and security systems help protect you and your passengers out there on the road."
- In 2006 Ford also represented in brochures that its cars contained a: "Personal Safety System®," which "enhances protection for the driver and front passenger in certain frontal collisions. The system customizes the deployment of the dual-stage front airbags based on several criteria, including the driver's seat position, whether the front safety belts are in use, the amount of pressure exerted on the front-passenger's seat, and the overall severity of the impact."
- In 2015 Ford represented on its website: "At Ford, we hold ourselves to very high standards for vehicle safety. The fact is, vehicle safety is a critical part of our brand promise to Go Further. We aim to give customers peace of mind and make the world safer by developing advanced safety technologies and making them available across a wide range of vehicles."

c. **Honda:**

- In 2002, Honda represented on its website: "Having already earned top safety ratings with its quadruple five-star front- and side-impact crash test ratings, the 2002 Odyssey now offers the latest generation of airbag systems from Honda. Driver's and front passenger's dual stage airbags (SRS) along with driver's and front passenger's side airbags are now standard equipment on all models - yet another minivan first… Both front airbags have a dual-stage inflator that can deploy the airbag at one of two rates depending on the severity of the crash… The front passenger's side airbag has an automatic cutoff system that is designed to prevent side airbag deployment if a child (or small statured adult) leans into the side airbag deployment path. Once the child returns to an upright position, the side airbag will be able to deploy and provide protection in the event of a side impact… Building on the standard anti-lock braking system (ABS), new standard rear disc brakes result in improved stopping performance with higher resistance to brake fade and a more responsive brake pedal feel. Amber rear turn signals have been added, which help other drivers differentiate the indicators with increased clarity."
- In 2002, Honda represented in a commercial: "5-stars of frontal collision tests… that's a safe car. Safe, get it through your head. To see what safe really means, take a look at a close look at the 2002 civic from Honda."
- In 2002, Honda represented in brochures: "Honda's commitment to safe driving is in evidence throughout every vehicle… Every new vehicle comes with dual front airbags (SRS), most using a dual stage design... All designed to keep you and yours out of harm's way."

- In 2004, Honda represented in brochures: "A glance at the crash-test data posted by the U.S. government's National Highway Traffic Safety Administration reveals a galaxy of 5-star ratings for Honda cars and trucks. In fact, five of our models to date – Accord Coupe, Civic Coupe, CR-V, Odyssey and Pilot – have earned the highest NHTSA crash-test ratings in frontal and side impact testing… It's a solid testament to our emphasis on safety."

- In 2007, Honda represented on its website: "Through innovative original research, Honda has created advanced airbags that offer outstanding levels of occupant protection."

- In 2007, Honda also represented on its website: "Honda led the industry through advances such as driver and front passenger airbags with "dual output inflators" that adjust the deployment force of the airbags to the severity of the crash."

- In 2007, Honda also represented on its website: "The Honda Accord is the first mid-size sedan to offer front, front-side and side curtain airbags as standard equipment. Accord earned a 5-star frontal impact rating from the U.S. government and a frontal "Best Pick" from the Insurance Institute for Highway Safety (IIHS)."

- In 2007, Honda also represented on its website: "Every Honda and Acura vehicle begins with a basic structure designed to be fundamentally safe, but we add advanced technology as standard equipment that can help the driver maintain control of the vehicle."

- In 2015, Honda represented on its website: "Honda is committed to providing safety for everyone—that means crash protection not only for our own drivers and passengers, but also for the occupants of other vehicles, and injury mitigation for pedestrians." "As a leader, Honda looks beyond government regulations, studying real world situations to develop new safety technologies for everyone."

- In 2015, Honda represented on its website: "Acura believes driving a luxury car should be a highly enjoyable experience. And while we tend to dwell on the more exhilarating aspects of our vehicles, we consider your safety a top priority. . . .  Safety has been top of mind with Acura engineers since day one. . . .  Over the years, we've added many advanced safety technologies to the list, and the vast majority of them are now standard on every model."

d. **Mazda**:
- In 2004, Mazda represented in brochures that its cars possessed "inspiring performance" and "reassuring safety features."

- In 2005, Mazda represented on its website: "in every configuration, you'll enjoy Mazda's legendary performance, function, style and safety."
- In 2015, Mazda represented on its website: "In the realm of safety, Mazda's aim is to achieve a safe and accident-free automotive society from the three viewpoints of vehicles, people, and roads and infrastructure. Specifically, the Company carries out research and development into safety technologies based on the Mazda Proactive Safety philosophy, which particularly respects the driver, and has released vehicles featuring the full suite of Mazda's advanced safety technologies…."

e. **Mitsubishi**:

- In 2007, Mitsubishi represented on its website that its vehicles were equipped with "Advanced front airbags."
- In 2015, Mitsubishi represented on its website:  "We are committed to providing the utmost driving pleasure and safety for our valued customers and our community.  On these commitments we will never compromise. This is the Mitsubishi Motors way."

f. **Nissan/Infiniti**:

- In 2005, Nissan represented in brochures that its vehicles possessed "an entire set of safety features to help protect you from the unavoidable. Including steel reinforcements, guard beams and advanced airbags that will help safeguard you and your passengers in the event of an accident."
- In 2015, Nissan represented on its website: "Nissan is committed to its position as a leader in the world of automotive safety. This dedication to comprehensive safety goes into the engineering and design of every vehicle we make…."

g. **Subaru**:

- In 2005, Subaru represented on its website: "Features like seatbelts with front pretensioners and force limiters, crumple zones, side-impact beams, front air bags and a Ring-Shaped Reinforcement Frame aid in minimizing the effects of a collision."
- In 2005, Subaru represented in its brochures: "THE SUBARU DRIVING EXPERIENCE EVOKES MANY EMOTIONS. Confidence should always be one of them. Which is why every Subaru is engineered according to the principles of "Active Driving/Active Safety."
-  In 2005, Subaru represented in its brochures: "Advanced front air bags, including passenger-side dual-stage deployment, help provide optimal protection for the driver and front passenger."
- In 2015, Subaru represented on its website: "Safety drives Subaru design."

h. **Toyota/Lexus**:

94

- In 2002, Toyota represented on its website: "With safety features like dual front air bags, crumple zones and 3-point seatbelts in every seating position. So gather up all the hikers -- big and small -- and head out. Way out."
- In 2015, Toyota represented on its website: "For us, the journey towards a safe road never ends. This belief, along with our collaborative research efforts, drives us to create advancements and innovations in safety that have helped (and continue to help) prevent crashes and protect people."

249.    Each of these statements are materially false statements that misrepresented and created confusion and likelihood of mistake as to the nature, characteristics, and qualities of its airbags, the root cause of Inflator Defect, the value of the vehicles in which its airbags were installed, the number of affected vehicles, and the extent of unreasonable danger of death or personal injury related to the Inflator Defect.

250.    Defendants' misleading representations of fact relating to the Defective Airbags caused actual injury to automotive recyclers and other industry participants.

251.    Defendants' statements were made in commercial advertising or in promotion of its Defective Airbags.

252.    Defendants had an economic motivation for making their statements, as they were incentivized to sell as many airbags and vehicles as possible and minimize lost profits associated with Defective Airbags.

253.    Takata's and the Defendants' misleading statements had a material effect on the purchasing decisions of automotive recyclers, including Plaintiff.  These omitted and concealed facts were material because they would be relied on by a reasonable business purchasing a new or used motor vehicle, and because they directly impact the value of the Class Vehicles purchased by Plaintiff and the Class.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products are material concerns to a purchaser.

Plaintiff and Class members trusted Defendants not to sell or fail to recall vehicles that were defective or that violated federal law governing motor vehicle safety.

254.    Defendants' statements were widely distributed, which is, at least, sufficient to constitute promotion within the automotive recycler industry.

255.    Thus, Defendants' misleading representations and statements are and/or were material and the direct cause of the injuries herein described.

256.    Defendants' products travel or traveled in interstate commerce.

257.    Plaintiff and the other Class members have and continue to be damaged and injured by Defendants' material misrepresentations and as a result of the false and misleading statements. Plaintiff and other Class members were injured and continue to suffer injury to, among other things, their property and possessory rights in the defective airbags, as well as the negative market price impact on the resale value of the Defective Airbags and parts of the Class Vehicles, which result in lower revenues and profits, as well as lost business and increased expenses. Those economic injuries are likely to continue in the future.

258.    Defendants' representations, statements, and commentary as more fully set forth herein were made with knowledge or reckless disregard of their falsity and the resulting risk and damage to the Plaintiff and other Class members.

259.    Defendants' acts constitute the use of false descriptions and false representations in interstate commerce in violation of § 43(a) of the Lanham Act and entitle Plaintiff, individually and on behalf of the other Class members, to recover damages, disgorgement of Defendants' profits, the costs of this action, and attorney's fees.

## <u>COUNT III</u>

### FRAUDULENT CONCEALMENT

260.    This claim is brought individually and on behalf of the Nationwide Automotive Recycler Class against all Defendants.

261.    As described above, Defendants made material omissions and affirmative misrepresentations regarding the Class Vehicles and the Defective Airbags contained therein.

262.    Defendants knew these representations were false when made.

263.    Defendants concealed and suppressed material facts regarding the Defective Airbags—most importantly, the Inflator Defect, which causes, among other things, the Defective Airbags to: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether.

264.    Defendants took steps to ensure that its employees did not reveal the known safety Inflator Defect to regulators or consumers.

265.    On information and belief, Takata still has not made full and adequate disclosure, continues to defraud Plaintiff and the Class, and continues to conceal material information regarding the Inflator Defect that exists in the Defective Airbags.

266.    Defendants had a duty to disclose the Inflator Defect because they:

   a.    Had exclusive and/or far superior knowledge and access to the facts than Plaintiff and Class members, and knew that the facts were not known to or reasonably discoverable by Plaintiff and the Class;

   b.    Intentionally concealed the foregoing from Plaintiff; and

  c.  Made incomplete representations about the safety and reliability of the

Defective Airbags and, by extension, the Class Vehicles, while purposefully

withholding material facts from Plaintiff that contradicted these representations.

267. These omitted and concealed facts were material because they would be relied on

by a reasonable consumer purchasing a new or used motor vehicle, and because they directly

impact the value of the Class Vehicles purchased by Plaintiff and the Class.  Whether a

manufacturer's products are safe and reliable, and whether that manufacturer stands behind its

products are material concerns to a consumer.  Plaintiff and Class members trusted Defendants

not to sell or fail to recall vehicles that were defective or that violated federal law governing

motor vehicle safety.

268. Defendants concealed and suppressed these material facts to falsely assure

purchasers and consumers that its vehicles were capable of performing safely, as represented by

them and reasonably expected by consumers.

269. Defendants actively concealed or suppressed these material facts, in whole or in

part, to maintain a market for their vehicles, to protect their profits, and to avoid recalls that

would their brands' image and cost them money.  Defendants concealed these facts at the

expense of Plaintiff and the Class.

270. Plaintiff and the Class were unaware of these omitted material facts and would

not have acted as they did if they had known of the concealed or suppressed facts.

271. Had they been aware of the Defective Airbags and Defendants' callous disregard

for safety, Plaintiff and Class members would have paid less for their Class Vehicles.  Plaintiff

and the Class did not receive the benefit of their bargain as a result of Defendants' fraudulent

concealment.

272.     Because of the concealment or suppression of the facts, Plaintiff and the Class sustained damage because they own vehicles that diminished in value as a result of Defendants' concealment of, and failure to timely disclose, the serious Inflator Defect in millions of Class Vehicles and the serious safety and quality issues caused by their conduct.

273.     The value of all Class Vehicles has diminished as a result of Defendants' fraudulent concealment of the Defective Airbags and made any reasonable consumer reluctant to purchase any of the Class Vehicles or the parts used to repair them, let alone pay what otherwise would have been fair market value for the vehicles or the parts to repair them.

274.     Accordingly, Plaintiff and the Class have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain or overpayment at the time of purchase, the diminished value of the defective airbags and the Class Vehicles and their constituent parts, and/or the costs incurred in storing, maintaining or otherwise disposing of the defective airbags.

275.     Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the Class's rights and well-being, and with the aim of enriching themselves.  Defendants' conduct, which exhibits the highest degree of reprehensibility, being intentional, continuous, placing others at risk of death and injury, and effecting public safety, warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT IV

### VIOLATION OF THE GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT, GA. CODE ANN. §§ 10-1-370 *ET SEQ.*

276.     This claim is brought on behalf of Weaver individually and on behalf of the Georgia Automotive Recycler Class against all Defendants.

277. Weaver, the Georgia Automotive Recycler Class, and Defendants are "persons" within the meaning of Georgia Uniform Deceptive Trade Practices Act ("Georgia UDTPA"), Ga. Code Ann. § 10-1-371(5).

278. The Georgia UDTPA prohibits "deceptive trade practices," which include the "misrepresentation of standard or quality of goods or services," and "engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." Ga. Code Ann. § 10-1-372(a). By failing to disclose and actively concealing the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them, Defendants engaged in deceptive trade practices prohibited by the Georgia UDTPA.

279. In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

280. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

281. Prior to installing the Defective Airbags in their vehicles, the Defendants knew or should have known of the Inflator Defect, because Takata informed them that the Defective Airbags contained the volatile and unstable ammonium nitrate and the Defendants approved Takata's designs.

282. Honda was again made aware of the Inflator Defect in the Takata airbags in

Honda's vehicles in 2004, following a rupture incident. And the Defendants were again made aware of the Inflator Defect in Takata's airbags not later than 2008, when Honda first notified regulators of a problem with its Takata airbags. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

283.   By failing to disclose and by actively concealing the Inflator Defect in the ClassVehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Georgia UDTPA.  Defendants deliberately withheld the information about the propensity of the DefectiveAirbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

284.   In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

285.   Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true safety and reliability of Class Vehicles and/or the

Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

286.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiff and the Georgia Sub-Class.

287.   Defendants knew or should have known that their conduct violated the Georgia UDTPA.

288.   As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

289.   To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the

290.   Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

291.   Defendants owed Weaver and the Georgia Automotive Recycler Class a duty to disclose the true safety and reliability of the

292.   Class Vehicles and/or the Defective Airbags installed in them because Defendants:

a.      Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.      Intentionally concealed the foregoing from Plaintiff; and/or

c.      Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiff that contradicted these representations.

293.    By failing to disclose and by actively concealing the Inflator Defect in the ClassVehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Georgia UDTPA.  Defendants deliberately withheld the information about the propensity of the DefectiveAirbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

294.    Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once theInflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

295.    Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Weaver and the Georgia Automotive Recycler Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

296.    Weaver and the Georgia Automotive Recycler Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Weaver and

the Georgia Automotive Recycler Classeither would have paid less for their vehicles or would not have purchased them at all. Plaintiff did not receive the benefit of their bargain as a result of Defendants' misconduct.

297.   Defendants' violations present a continuing risk to Weaver and the Georgia Automotive Recycler Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

298.   As a direct and proximate result of Defendants' violations of the Georgia UDTPA, Weaver and the Georgia Automotive Recycler Class have suffered injury-in-fact and/or actual damage.

299.   Weaver and the Georgia Automotive Recycler Class seeks an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia UDTPA per Ga. Code Ann. § 10-1-373.

## COUNT V

### VIOLATION OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT, N.C. GEN. STAT. §§ 75-1.1, *ET SEQ.*

300.   This claim is brought by Weaver individually and on behalf of the North Carolina Automotive Recycler Class against all Defendants.

301.   Defendants engaged in "commerce" within the meaning of N.C. Gen. Stat. § 75-1.1(b).

302.   The North Carolina Act broadly prohibits "unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a). As alleged above and below, Defendants willfully committed unfair or deceptive acts or practices in violation of the North Carolina Act.

303.   In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags

installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

304.    Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

305.    Prior to installing the Defective Airbags in their vehicles, the Defendants knew or should have known of the Inflator Defect, because Takata informed them that the Defective Airbags contained the volatile and unstable ammonium nitrate and the Defendants approved Takata's designs. In addition, Defendant Honda was again made aware of the Inflator Defect in the Takata airbags in Honda's vehicles in 2004, following a rupture incident. And the Defendants were again made aware of the Inflator Defect in Takata's airbags not later than 2008, when Honda first notified regulators of a problem with its Takata airbags. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

306.    By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the North Carolina Act. Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy altogether, instead of protecting vehicle occupants

from bodily injury during accidents, in order to ensure that the Class Vehicles were purchased.

307.    In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

308.    Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in purchasers, were likely to and did in fact deceive reasonable purchasers, including Weaver and the North Carolina Automotive Recycler Class, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

309.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Weaver and the North Carolina Automotive Recycler Class.

310.    Defendants knew or should have known that their conduct violated the North Carolina Act.

311.    As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

312.    To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting

new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

313.    Defendants owed Weaver and the North Carolina Automotive Recycler Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

  a. Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

  b. Intentionally concealed the foregoing from Weaver and the North Carolina Automotive Recycler Class; and/or

  c. Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Weaver and the North Carolina Automotive Recycler Class that contradicted these representations.

314.    Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

315.    Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Weaver and the North Carolina Automotive Recycler Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

316.    Weaver and the North Carolina Automotive Recycler Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.

Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Weaver and the North Carolina Automotive Recycler Class either would have paid less for their vehicles or would not have purchased them at all. Weaver and the North Carolina Automotive Recycler Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

317.   Defendants' violations present a continuing risk to Weaver and the North Carolina Automotive Recycler Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

318.   As a direct and proximate result of Defendants' violations of the North Carolina Act, Weaver and the North Carolina Automotive Recycler Class have suffered injury-in-fact and/or actual damage.

319.   Weaver and members of the North Carolina Automotive Recycler Class seek punitive damages against Defendants because Defendants' conduct was malicious, willful, reckless, wanton, fraudulent and in bad faith.

320.   Defendants fraudulently and willfully misrepresented the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them, deceived Weaver and North Carolina Automotive Recycler Class members on life-or-death matters, and concealed material facts that only they knew, all to avoid the expense and public relations nightmare of correcting the myriad flaws in the Class Vehicles and/or the Defective Airbags installed in them. Because Defendants' conduct was malicious, willful, reckless, wanton, fraudulent and in bad faith, it warrants punitive damages.

321.   Weaver and the North Carolina Automotive Recycler Class seek an order for treble their actual damages, an order enjoining Defendants' unlawful acts, costs of Court, attorney's

fees, and any other just and proper relief available under the North Carolina Act, N.C. Gen. Stat. § 75-16.

## PRAYER FOR RELIEF

Plaintiff, on behalf of itself and all others similarly situated, request the Court to enter judgment against Defendants, as follows:

A.      An order certifying the proposed Classes, designating Plaintiff as the named representative of the Classes, and making such further orders for the protection of Class members as the Court deems appropriate, under Fed. R. Civ. P. 23.;

B.      A declaration that the airbags in Class Vehicles are defective;

C.      A declaration that Defendants are financially responsible for notifying all Class embers about the defective nature of the Class Vehicles;

D.      An order enjoining Defendants to desist from further deceptive distribution, sales, and lease practices with respect to the Class Vehicles, and directing Defendants to permanently, expeditiously, and completely repair the Class Vehicles;

E.      An award to Plaintiff and Class members of compensatory, exemplary, and punitive remedies and damages and statutory penalties, including interest, in an amount to be proven at trial;

F.      An award to Plaintiff and Class members for the return of the purchase prices of the Class Vehicles, with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale, for damages and for reasonable attorney fees;

G.      A Defendant-funded program, using transparent, consistent, and reasonable protocols, under which out-of-pocket and loss-of-use expenses and damages claims associated with the Defective Airbags in Plaintiff's and Class members' Class Vehicles, can be made and

paid, such that Defendants, not the Class members, absorb the losses and expenses fairly traceable to the recall of the vehicles and correction of the Defective Airbags;

H.      A declaration that Defendants must disgorge, for the benefit of Plaintiff and Class members, all or part of the ill-gotten profits they received from the sale or lease of the Class Vehicles, or make full restitution to Plaintiff and Class members;

I.      An award of attorneys' fees and costs, as allowed by law;

J.      An award of prejudgment and post judgment interest, as provided by law;

K.      Leave to amend this Complaint to conform to the evidence produced at trial; and

L.      Such other relief as may be appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

**Dated:**   February 22, 2018

**CONLEY GRIGGS PARTIN LLP**

/s/   *Cale Conley*
Cale Conley
Georgia Bar No. 181080
4200 Northside Parkway NW
Building One, Suite 300
Atlanta, GA 30327
Phone: (404) 467-1155
Fax: (404) 467-1166
cale@conleygriggs.com

*Application for Admission Pro Hac Vice*
*to be Filed For:*

**MCCULLEY MCCLUER PLLC**
R. Bryant McCulley

110

Stuart H. McCluer
Frank B. Ulmer
1022 Carolina Boulevard, Suite 300
P.O. Box 505
Charleston, SC 29451
Phone: (205) 238-6757
Fax: (904) 239-5388
bmcculley@mcculleymccluer.com
smccluer@mcculleymccluer.com
fulmer@mcculleymccluer.com

**STUCKY & FIELDS LLC**
Christopher J. Stucky
Benjamin C. Fields
214 W. 18th St., Suite 200
Kansas City, MO 64108
Telephone: (816) 659-9970
Facsimile: (816) 659-9969
chris@stuckyfields.com
ben@stuckyfields.com

**BOIES SCHILLER FLEXNER LLP**
Richard B. Drubel
Jonathan R. Voegele
26 South Main Street
Hanover, NH 03755
Tel: (603) 643-9090
Fax: (603) 643-9010
rdrubel@bsfllp.com
jvoegele@bsfllp.com

*Counsel for Plaintiff and the Proposed Classes*

111